**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

CHURCH OF OUR SAVIOR, formerly
known as Resurrection Anglican
Church, Inc., a Florida Nonprofit
Corporation,

        Plaintiff,

v.                                      Case No. 3:13-cv-1346-J-32JBT

THE CITY OF JACKSONVILLE
BEACH, a Florida Municipal
Corporation,

        Defendant.

_____

**ORDER ON DEFENDANTS' MOTION TO**
**DISMISS PLAINTIFF'S AMENDED COMPLAINT**

    The Church of Our Savior wants to build a church on private property in Jacksonville Beach.  Citing incompatibility with the neighborhood, the City of Jacksonville Beach will not allow it to do so.  The Church claims the City's actions violate its federal right to be free from religious discrimination.

    After initially pleading eight causes of action alleging violations of its constitutional and statutory rights and then facing a motion to dismiss, the Church has now pared back its claims into a five-count amended complaint.  For many of the same reasons it found the first complaint lacking, the City finds the second attempt inadequate and has again moved to dismiss.  The Church, for its part, finds the City's motion improper and urges the Court to deny it and levy sanctions against the City's

lawyers.

## I.    BACKGROUND

### A.    The Church

The Church of Our Savior, formerly known as Resurrection Anglican Church, was founded in 2006 as a Florida nonprofit corporation with the stated mission "to revel in and share the grace that God has shown them" by encouraging members of the community to attend the Church's religious services.[1] (Am. Compl. ¶¶ 8-9, Doc. 32.) The Church's services include bible studies, service to the homeless and to nearby schools, and worship services on Sundays and holy days. (Id., ¶¶ 10-11, 13.) In May 2013, Resurrection Anglican Church and Calvary Anglican Church merged. (Id., ¶ 13.) For this and other reasons, the Church has seen substantial growth since its founding.[2] (Id., ¶¶ 10, 12-13.) The Church currently holds its Sunday services in the Beaches Museum Chapel, a historic wooden chapel, which the Church rents from the Beaches Historical Society. (Id., ¶¶ 14-15.) The Church represents that its rental arrangement limits its ability to schedule services as it wishes or make changes to the

---

[1] The Court draws the facts set forth in this background section largely from the allegations in the amended complaint, which are taken as true and from which all reasonable inferences are drawn in the Church's favor for purpose of the motion to dismiss. Castro v. Sec'y of Homeland Sec., 472 F.3d 1334, 1336 (11th Cir. 2006); Hill v. White, 321 F.3d 1334, 1335 (11th Cir. 2003). Additionally, the exhibits attached to the complaint are considered part of the complaint and control over any contradictory allegations in the complaint. Griffin Indus., Inc. v. Irvin, 496 F.3d 1189, 1199, 1206 (11th Cir. 2007).

[2] The amended complaint states that the Church currently has "roughly 110 church members and weekly parishioners" (Doc. 32 at ¶ 7), and cites to two pages from the Church's website, Exhibit 1 to the complaint. Neither webpage, however, says anything about the Church's membership numbers.

structure to fit the Church's needs.  (Id., ¶15.)  For the past two years, the Church has used a facility next to the chapel for its administrative offices and meeting rooms, for a Friday women's bible study, for choir practice, and for educational activities.  (Id., ¶¶ 16, 19.)  Other church activities are apparently held in local restaurants or church members' homes.  (Id., ¶¶ 17-18.)  According to the Church, this arrangement has impacted its ability to attract new members and hold weddings, funerals, and classes, and has created logistical problems in setting up Sunday services.  (Id., ¶¶ 20-23.)

### B.   The Property

The Church leadership decided to address these concerns and look for "one ideal location for all of the Church's religious activities."  (Id., ¶ 25.)  In early 2012, the Church identified property for sale at 2092 Beach Boulevard, Jacksonville Beach, Florida (the "Property") that it thought fit the bill.  (Id., ¶¶ 26, 32.)  The crescent-shaped property is actually two parcels of land, separated by a strip of city-owned land.[3]  (Id., ¶ 27.)  The Church has purchased an option on the Property and hopes to build a church facility on it.  (Id., ¶ 31.)

### C.   The Jacksonville Beach Land Development Code

The Property is currently zoned "Residential, single family (RS-1)" under the Jacksonville Beach Land Development Code ("LDC").[4]  (Id., ¶ 33.)  The LDC establishes a total of thirteen zoning districts "to ensure that each permitted and

---

[3] This strip of city land is used to access a sewer lift station.  (Id., ¶¶ 28, 34.) The public works department has apparently indicated that the Church's proposal would not interfere with access to the lift station.  (Id., ¶ 42.)

[4] In its response brief, the Church attempts to raise an issue regarding how the Property came to be zoned RS-1.  The Court addresses that issue briefly later.

conditional use is compatible with surrounding land uses, served by adequate public facilities, and sensitive to natural and coastal resources."  LDC Secs. 34-321, -322. Each district has certain "permitted uses" and "uses accessory to permitted uses" that are allowed in the district as of right and certain "conditional uses" that may be allowed upon submission of an application for a Conditional Use Permit ("CUP") and the review and approval of the planning and development director and the planning commission.  LDC Secs. 34-41, -221 to -236, -321.

The RS-1 zoning district "is intended to classify areas suitable for low density single-family residential development."  LDC Sec. 34-336(a).  "Single family dwellings," "[p]ublic and private parks, playgrounds and recreational facilities," and "Type I home occupation"[5] are uses permitted as of right on property zoned RS-1.  Id. at (b).  Permitted private parks, playgrounds and recreational facilities cannot be for commercial use, however, and are restricted to "the sole use of residents living in the area where such facilities are located . . . ."  Id. at (b)(2).  Conditional uses on property zoned RS-1 include, among other things, "[r]eligious organizations" and "[p]ublic and private elementary and secondary schools and technical institutes, excluding trade schools and vocational schools."  Id. at (d).

"*Religious organization* means a structure or place in which worship, ceremonies, rituals, and education pertaining to a particular system of beliefs are held."  LDC Sec. 34-41.  Out of the City's thirteen zoning districts, religious organizations are conditional uses in all five residential zones (RS-1, RS-2, RS-3, RM-

---

[5] "Type I home occupation" generally means a home office.  LDC Sec. 34-41.

1, and RM-2) and three of the five commercial zones (CPO, CS, CBD), are permitted as of right in the other two commercial zones (C-1, C-2), and are not permitted at all in the City's industrial zone (I-1), redevelopment district (RD), or planned unit development district (PUD).  LDC Secs. 34-336 to -348.

Uses listed as conditional in a particular zoning district are eligible for a CUP, but are not guaranteed to receive one.  LDC Sec. 34-223.  Instead, the planning and development director and the planning commission are supposed to evaluate each application for CUP based on a set of eleven general standards and the standards of the particular zone in which the CUP is requested.  Id.; see LDC Sec. 34-231.  To receive a CUP, the property owner submits an application with certain required information to the planning and development director.  LDC Secs. 34-225, 226.  The director reviews the application for initial sufficiency, and, if it is sufficient, prepares a report on the application and schedules the application for a public hearing before the planning commission.  LDC Secs. 34-228, 229.  At the hearing, the planning commission reviews the application and the director's report, hears any public testimony, and then issues an order approving the application, approving it with conditions, or denying it.  LDC Sec. 34-230.  The LDC does not include any review mechanism where the applicant can appeal the commission's ruling to the full city council or some other city body.  Instead, according to the City, denials or approvals with conditions must be appealed to the state circuit court through a petition for writ of certiorari.  (See Doc. 40 at 2.)

### D.    The First CUP Application

The Church submitted its first application for a CUP in early March 2013.  (Doc. 32 at ¶ 39.)  The Church proposed building a one-story, 7,440 square foot building with a more than 200-person capacity sanctuary and additional space, with the southern part of the Property proposed as a children's play area for the congregation.  (Id., ¶ 29.)   The Planning and Development Department staff prepared a report recommending approval of the application.  (Id., ¶¶ 42-43, Ex. 10.)  The report states that the proposal of a church is not inconsistent with the City's Comprehensive Plan and "represents a reasonable low intensity use of the undeveloped parcels surrounding the City's lift station, and would serve as transition between the soon to be developed commercial parking facilities to the east, and the Hopson Road neighborhood to the west and south."  (Id., Ex. 10.)

On April 8, 2013, the Planning Commission held a public hearing on the application.[6]  (Id., ¶ 45.)  The planning department staff read the report and a representative for the Church made a presentation.  (Id., Ex. 13.)  The hearing was then opened to the public, at which point the Church's reverend and the project architect addressed the proposed building's height.  (Id.)  Five residents from the neighborhood around the Property spoke in opposition to the proposal.  (Id.)  The Church's representative then was permitted a rebuttal, and the reverend answered additional questions.  (Id.)  Planning Commission Vice Chairperson Terry DeLoach

_____

[6] At the Court's request, the Church submitted the transcripts of this hearing and the subsequent planning commission hearing.  (See Doc. 34.)  The Court considers these transcripts to the extent appropriate.

expressed his concern about the proximity of the project to the surrounding residences, its compatibility with the neighborhood, and its effect on property values.  (<u>Id.</u>)  The Commission then unanimously voted to disapprove the application.  (<u>Id.</u>)

### E.   The Second CUP Application

Though the details are unclear, the Church and the City apparently discussed options for moving forward.  (<u>Id.</u>, ¶ 47.)  In August 2013, the Church submitted a second application for CUP.  (<u>Id.</u>, ¶ 48, Ex. 14.)  The application was the same as the first, except the children's play area on the southern parcel was now designated as a park open to neighborhood children.  (<u>Id.</u>, ¶ 48, Ex. 14.)  The Planning and Development Department again recommended approval, for the same reasons as before.  (<u>Id.</u>, ¶ 51, Ex. 16.)

The Planning Commission held a public hearing on the second application on September 9, 2013.  (<u>Id.</u>, ¶ 49, Ex. 16.)  A representative of the Church again made a presentation, highlighting the change to the designation of the southern parcel and the Church's intention to stay small and be respectful of the community, and answering questions from Mr. DeLoach.  (<u>Id.</u>, Ex. 16.)  The hearing was then opened to the public, when some individuals spoke in favor of and answered questions about the project while a number of potential neighbors and Commissioners expressed concern or opposition.  (<u>Id.</u>)  The Commission then again unanimously voted to deny approval.  (<u>Id.</u>, ¶ 52, Ex. 16.)

On September 23, 2013, the Commission approved certain Findings of Fact identifying three reasons for the denial:  (1) the proposal "is not consistent with the

character of the immediate vicinity;" (2) the proposal is "inconsistent" with the City's Comprehensive Plan, which requires future institutional uses, like churches, to be located outside of low-density residential areas; and (3) changing the designation of the children's play area to a public park meant the proposed building would exceed the maximum of 35% lot coverage for property zoned RS-1.  (Id., Ex. 18.)  The Church did not file any petition in state court to review the Commission's determinations.

### F.    Procedural History of This Case

On November 1, 2013, the Church filed a Verified Complaint for Declaratory and Injunctive Relief, requesting that the Court declare invalid the City's denial of the Church's CUP application and let the Church use the Property as a church for religious assembly.  (Verified Compl. 24-25, Doc. 1.)  The initial complaint included eight counts, including two counts alleging a violation of The Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. §§ 2000cc, three counts brought under 42 U.S.C. § 1983 alleging violations of the United States Constitution, two counts alleging violations of the Florida Constitution, and one count alleging violation of the Florida Religious Freedom Restoration Act, Florida Statutes, § 761.03. (Id., ¶¶ 77-144.)

On the same day it filed its complaint, the Church moved for a preliminary injunction, asking the Court to mandate that the Church be allowed to build and operate a church on the Property.  (Mot. for Prelim. Inj. 9, Doc. 2.)  The City later filed a motion to dismiss each of the Church's claims.  (Mot. to Dismiss, Doc. 12.)  On February 18, 2014, the Court held a hearing on the motion for preliminary injunction

and the motion to dismiss, the record of which is incorporated herein.  (Minute Entry, Doc. 27; Mot. Hr'g Tr., Doc. 34.)  For the reasons stated on the record at the hearing, the Court denied the Church's motion for preliminary injunction and granted the motion to dismiss. (2/19/2014 Order, Doc. 28.)  However, the Court allowed the Church to re-plead its complaint and provided some guidance as to how the case might be focused on the true issues at play.  (Doc. 34 at 62-66.)  At the same time, the Court set a briefing schedule for any motion to dismiss the amended complaint the City would file. (Doc. 28.)

On March 6, 2014, the Church filed an amended complaint narrowing its claims to five counts based on RLUIPA, four of which challenge the LDC as it had been applied to the Church and one of which challenges the LDC on its face.[7]  (Doc. 32.) The City moved to dismiss the amended complaint.  (Mot. to Dismiss Am. Compl., Doc. 40.) The Church responded (Resp., Doc. 41), and with the Court's permission, the City replied (Reply, Doc. 47).

## II.   STANDARD OF REVIEW

When considering a Rule 12(b)(6) motion to dismiss, the court must accept all factual allegations in the complaint as true and construe them in the light most favorable to the plaintiff.  Castro v. Sec'y of Homeland Sec., 472 F.3d 1334, 1336 (11th Cir. 2006); Hill v. White, 321 F.3d 1334, 1335 (11th Cir. 2003).  "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that

---

[7] While the Church dropped certain counts from the original complaint, it also inserted a fair bit of legal analysis, including case citations, into the amended complaint.  (See, e.g., Doc. 32 at ¶¶ 62-63, 69-72, 75, 78-81, 100-101.)

the pleader is entitled to relief.'" Erickson v. Pardus, 551 U.S. 89, 89 (2007). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570). A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. Id. (citation and quotation omitted). Whether a complaint gives reasonable notice is a question of law. Bejil v. Ethicon, Inc., 269 F.3d 477, 481 (5th Cir. 2001); Evans v. McClain of Ga., Inc., 131 F.3d 957, 964 n.2 (11th Cir. 1997).

## III. ANALYSIS

### A. Re-Zoning of the Property

Before reaching the substance of the City's motion to dismiss, the Court first briefly addresses the Church's argument regarding the validity of the Property's zoning as RS-1 (see Doc. 41 at 5-7). The amended complaint contains no allegation or cause of action regarding the alleged impropriety of the zoning of the property. And though the amended complaint includes many exhibits, the Church's argument on this issue rests entirely upon materials outside the pleadings, primarily the deposition of the City's Director of Planning and Development (Doc. 41 at 5-7). The Court therefore declines to address the validity of the Property's zoning in the context of this motion to dismiss, including the City's suggestion that any claim to invalidate the zoning is barred by the statute of limitations (Doc. 47 at 4).[8]

---

[8] Moreover, to the extent the Church's response can be read to be asking for

**B.      The Religious Land Use and Institutionalized Persons Act of 2000**

Turning now to the substance of the motion, RLUIPA supplies the four operative limitations on how government land use regulations may intersect with religious exercise:

**(a) Substantial burdens**

**(1) General rule**
No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution—

(A) is in furtherance of a compelling governmental interest; and

(B) is the least restrictive means of furthering that compelling governmental interest

. . . .

**(b) Discrimination and exclusion**

**(1) Equal terms**
No government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution.

**(2) Nondiscrimination**
No government shall impose or implement a land use regulation that discriminates against any assembly or institution on the basis of religion or religious denomination.

**(3) Exclusions and limits**
No government shall impose or implement a land use regulation that—

---

discovery on this issue (see Doc. 41 at 7), the Court denies the request on the grounds that a response to a motion to dismiss, rather than an appropriate discovery request or motion to compel, is not the appropriate mechanism to seek affirmative relief. See Rosenberg v. Gould, 554 F.3d 962, 967 (11th Cir. 2009); Fed. R. Civ. P. 7(b)(1) ("A request for a court order must be made by motion.").

> (A) totally excludes religious assemblies from a jurisdiction; or
> (B) unreasonably limits religious assemblies, institutions, or structures within a jurisdiction.

42 U.S.C. § 2000cc (2012). Section 2000cc-2 permits a person to assert a violation of these provisions in a judicial proceeding, as long as they have standing under "the general rules of standing under article III of the Constitution." Id. § 2000cc-2(a).[9] The prohibitions in § 2000cc apply to "a State, county, municipality or other governmental entity created under the authority of the State," their branches, departments, agencies, instrumentalities, and officials, and to "any other person acting under color of State law." Id. § 2000cc-5(4).

The Church alleges that the City violated each provision of RLUIPA by denying both of the Church's CUP applications and that, on its face, the LDC violates the Equal Terms provision by allowing certain secular assemblies as of right on property zoned RS-1, but classifying religious assemblies as conditional uses that require a permit.

### 1.   The Substantial Burden Provision

Count I of the amended complaint brings a claim under section (a) of RLUIPA, the Substantial Burden provision, which provides that a land use restriction may not substantially burden "religious exercise" unless it is "the least restrictive means of

---

[9] RLUIPA claims brought under § 2000cc(a), the Substantial Burden provision, must meet one of three additional jurisdictional requirements dealing with whether the land use restriction in question (A) is part of a federally-funded program, (B) affects interstate commerce, or (C) involves "individualized assessments of the proposed uses for the property involved." Id. § 2000cc(a)(2). The City does not dispute that at least subpart (C) is met here.

furthering a compelling governmental interest." <u>Midrash Sephardi, Inc. v. Town of Surfside</u>, 366 F.3d 1214, 1225 (11th Cir. 2004). "The term 'religious exercise' includes any exercise of religion, whether or not compelled by, or central to, a system of religious belief," as well as "[t]he use, building, or conversion of real property for the purpose of religious exercise." 42 U.S.C. § 2000cc-5(7).

RLUIPA does not define "substantial burden," but the Eleventh Circuit has held that:

> [A] 'substantial burden' must place more than an inconvenience on religious exercise; a 'substantial burden' is akin to significant pressure which directly coerces the religious adherent to conform his or her behavior accordingly. Thus, a substantial burden can result from pressure that tends to force adherents to forego religious precepts or from pressure that mandates religious conduct.

<u>Midrash</u>, 366 F.3d at 1227 (11th Cir. 2004).

The City argues that Count I should be dismissed because neither the requirement that churches apply for CUPs on property zoned RS-1 nor the City's denials of the Church's applications can legally constitute substantial burdens. (Doc. 40 at 7-10.) As the City notes (<u>id.</u> at 7-8), and the Church apparently acknowledges (<u>see</u> Doc. 41 at 9), the Eleventh Circuit has indicated that "'run of the mill' zoning considerations" like "[r]equiring churches and synagogues to apply for CUPs" do not amount to a substantial burden. <u>Midrash</u>, 366 F.3d at 1227 n.11; <u>see</u> <u>Konikov v. Orange Cnty., Fla.</u>, 410 F.3d 1317, 1323-24 (11th Cir. 2005). The City argues that the denials of the Church's CUP applications, moreover, do not impose substantial burdens either because the Church can choose to continue its current operations at the Beach Museum Chapel or relocate to any of the large areas covered by the C-1 and

C-2 zones.  (Doc. 40 at 9-10.)  "That the [religious organization] may be unable to find suitable alternative space does not create a substantial burden within the meaning of RLUIPA."  Midrash, 366 F.3d at 1227 n.11.  RLUIPA does not relieve religious organizations from "'the harsh reality of the marketplace [that] sometimes dictates that certain facilities are not available to those who desire them.'"  Id. (quoting Love Church v. City of Evanston, 896 F.2d 1082, 1086 (7th Cir. 1990)).  Thus, in the City's view, the Church's claim under the substantial burden provision of RLUIPA should be dismissed.

In response, the Church correctly notes that it has removed any suggestion in the amended complaint that the LDC facially imposes a substantial burden by requiring the Church to apply for a CUP, but focuses instead on the Planning Commission's two denials of the Church's applications for a CUP.  (Doc. 41 at 9.)  The Church wishes to build a facility on what it claims is the only available property to ideally fit its needs, and the City's denial of its applications for a CUP means the Church cannot do so.  (Id. at 8-9.)  Thus, the Church is left with its rolling, six-month lease on the Beaches Museum Chapel, a less than ideal location, with no guarantee the lease will continue to be renewed.  (Id. at 9.)  The Church contends this amounts to a clear substantial burden.

The motion to dismiss quotes at length from the ruling of another court in this District that warrants further discussion (though the Church elected to not address the case in its response).  (Doc. 40 at 8-9.)  In Men of Destiny Ministries, Inc. v. Osceola County, the plaintiff had begun renovations to a piece of property in Osceola County

in order to operate a Christian drug and alcohol rehabilitation program.  No. 6:06-cv-624-Orl-31DAB, 2006 WL 3219321, at *1-2 (M.D. Fla. Nov. 6, 2006) (Presnell, J.).  The property was zoned in such a manner, however, that plaintiff would need a CUP to operate the seven-to-fourteen-person residential facility it had planned.  Id. at *2.  When the renovations came to the county's attention, it cited plaintiff for a number of building permit violations and for not having a CUP.  Id.  Plaintiff addressed the building permit violations and then began the process of applying for and working with the county planning commission to obtain a CUP.  Id.  Staff members of the planning commission recommended the application be approved with conditions.  Id.  But when the planning commission itself convened to vote on the application, plaintiff's neighbors spoke against the application, and the planning commission voted 6-2 to deny it.  Id. at *3.  The application then went to the full county commission for a final decision, where the vote was 4-0 to deny the CUP and give the plaintiff forty-five days to relocate.  Id.  The plaintiff filed suit against the county on a number of grounds, including allegedly violating the Substantial Burden provision.  Id. at *1, 4.

After expediting the case for bench trial, Judge Presnell ultimately ruled that the county's denial of the plaintiff's CUP did not impose a substantial burden, relying in large part on the Eleventh Circuit's opinion in Midrash.  Id. at *5.  Judge Presnell noted that there was no allegation that the plaintiff could only exercise its religion on the property in question or only through its planned residential facility, so it was free to adjust its facility or to relocate to a location where it might operate as of right.  Id.  "[Plaintiff] may believe that other locations or other methods would be less convenient

15

or less effective, but so long as other locations and methods are reasonably available, Osceola County has not imposed a substantial burden on [plaintiff's] religious exercise." Id. The Court entered judgment in favor of the county. Id. at *8.

Men of Destiny Ministries and the other authority cited by the City could potentially influence the outcome of this case. But the most striking aspect of Men of Destiny Ministries at this point is that Judge Presnell had the benefit of a record developed through discovery and trial, while this Court must take the allegations in the amended complaint as true. The amended complaint outlines a number of burdens the current arrangement places on the Church's operations and potential for growth. These burdens were not the result of the City's denials of a CUP and are, to a large extent, the kinds of burdens any organization, religious or secular, might face. The City's denials, however, have the effect of preventing the Church from attempting to alleviate these burdens in what is allegedly the only viable means, which places another kind of burden on the Church. Rather than decide the issue on a less than fulsome record, the Court finds Count I adequate at the pleadings stage and denies the City's request that it be dismissed.

## 2.   **The Equal Terms Provision**

The City next moves to dismiss Count II, the Church's facial and as-applied challenges under § (b)(1) of RLUIPA, the Equal Terms provision. The Equal Terms provision states that "[n]o government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution." 42 U.S.C. § 2000cc(b)(1). To

16

establish an Equal Terms violation, the plaintiff must make a <u>prima</u> <u>facie</u> showing that it is (a) a religious assembly or institution; (b) subject to a land use regulation; (c) that treats it on less than equal terms; (d) with a nonreligious assembly or institution. <u>Primera Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward Cnty.</u>, 450 F.3d 1295, 1307-08 (11th Cir. 2006); <u>see</u> 42 U.S.C. § 2000cc(b)(1); 42 U.S.C. § 2000cc-2.  If the plaintiff makes this showing, the defendant government then bears the burden of attacking an element of the claim or establishing that the conduct at issue "employs a *narrowly* tailored means of achieving a *compelling* government interest."  <u>Primera</u>, 450 F.3d at 1308 (citing <u>Midrash</u>, 366 F.3d at 1232).  A plaintiff may bring three distinct kinds of Equal Terms violations:  "(1) a statute that facially differentiates between religious and nonreligious assemblies or institutions; (2) a facially neutral statute that is nevertheless "gerrymandered" to place a burden solely on religious, as opposed to nonreligious, assemblies or institutions; or (3) a truly neutral statute that is selectively enforced against religious, as opposed to nonreligious assemblies or institutions."[10] <u>Id.</u>

The Eleventh Circuit has explained that, in evaluating unequal treatment, courts do not look for "similarly situated" secular comparators of any kind, but only at "assemblies and institutions."  <u>Midrash</u>, 366 F.3d at 1227.  Though RLUIPA does not define "assembly" or "institution," the Eleventh Circuit gives the terms their natural

---

[10] The amended complaint identifies the Church's facial challenge as "the third type of violation" and its as-applied challenge as "the second type of violation." (Doc. 32 at ¶¶ 71, 80.)  The Court will decide the motion to dismiss based on the well-pleaded allegations of the complaint rather than what appear to be ill-fitting labels.

(read: dictionary) meaning.  Id. at 1230.  So, "an 'assembly' is 'a company of persons collected together in one place [usually] and usually for some common purpose (as deliberation and legislation, worship, or social entertainment).'" An "institution" is more formal: "an established society or corporation:  an establishment or foundation [especially] of a public character."  Id. at 1230-31.

### a.    *Facial Challenge*

The City argues that the Church's facial Equal Terms challenge should be dismissed because the LDC actually treats religious organizations equal to or better than similar, nonreligious assemblies.  (Doc. 40 at 11-12.)  For instance, similar assemblies, like schools, must also obtain CUPs to operate on RS-1 property, while social groups and fraternal organizations are not permitted to operate on RS-1 property at all.  (Id.); see LDC Sec. 34-336.

In the amended complaint, and again in its response, the Church argues that the zoning classification for "public and private parks, playgrounds, and recreational facilities" is a better comparator.  The LDC permits these uses on RS-1 property as of right, whereas a religious organization has to apply for a CUP to operate on the same property (and potentially be denied).  (Doc. 32 at ¶¶ 74-76; Doc. 41 at 10-11); compare LDC Sec. 34-336(b)(2) with (c)(2).

The Church's primary support for pointing to parks as the correct comparator is Covenant Christian Ministries, Inc. v. City of Marietta, in which the Eleventh Circuit rejected the City of Marietta's argument that "private parks, playgrounds, and neighborhood recreation centers" are not "assemblies" within the meaning of RLUIPA.

654 F.3d 1231, 1246 (11th Cir. 2011).  Like churches, "they are places where 'groups or individuals dedicated to similar purposes—whether social, education, recreational, or otherwise—can meet together to pursue their interests," even if groups may assemble at parks for different reasons.  Id.

The City replies that the court in Covenant was addressing different circumstances than this Court.  (Doc. 47 at 6-7.)  For one thing, the ordinance in that case had recently been amended from allowing religious organizations in the zoning district at issue (with a minimum acreage) to prohibiting them entirely, while "private parks, playgrounds, and neighborhood recreation centers" were still allowed.  (Id.); Covenant, 654 F.3d at 1236-37.  Second, the City of Jacksonville Beach LDC only allows "public and private parks, playgrounds and recreational facilities" as of right on RS-1 property if they are "for the sole use of residents living in the area where such facilities are located, and shall not be used for commercial purpose."  (Doc. 47 at 6-7); LDC Sec. 34-336(b)(2).  The City argues that there is no indication that the Marietta ordinance had a similar limitation.  See Covenant Christian Ministries, Inc. v. City of Marietta, No. 1:06-CV-1994-CC (N.D. Ga.), Doc. 106-3.

The City's first distinction falls flat, however, because an ordinance need not completely exclude religious organizations to violate the Equal Terms provision, just treat them "on less than equal terms with a nonreligious assembly or institution." Midrash, 366 F.3d at 1233; see 42 U.S.C. § 2000cc(b)(1).

The City's second distinction has more initial appeal, but also fails.  The Marietta ordinance did not include precisely the same limiting language as the LDC

19

here, but did refer to "*neighborhood* recreation centers," indicating that the Eleventh Circuit did have in mind limited uses like those at issue here when it held that parks, playgrounds, and recreation centers are assemblies for purpose of RLUIPA. Covenant, 654 F.3d at 1236-37 (emphasis added).  Moreover, whether the types of parks, playgrounds, and recreation centers encompassed within LDC Section 34-336(b)(2) are proper comparators, and, if so, whether the City had a compelling reason to treat them differently, are better decided at trial, see Primera, 450 F.3d at 1308 (citing Midrash, 366 F.3d at 1232).  The Court finds that the Church has adequately pleaded a facial Equal Terms challenge and should be allowed to proceed on Count II of the amended complaint.

### b.   *As-Applied Challenge*

"A plaintiff bringing an as-applied Equal Terms challenge must present evidence that a *similarly situated* nonreligious comparator received differential treatment under the challenged regulation." Primera, 450 F.3d at 1311.  The amended complaint points to four comparators—two churches, one private school, and one public school—where the City granted CUPs on RS-1 property.  (Doc. 32 at ¶¶ 37, 87.) The Church alleges that by denying its application but granting these, the City has, in practice, treated the Church on less than equal terms with nonreligious assemblies. (Id., ¶ 88.)

The City correctly notes in its motion (and the Church appears to concede in its response) that religious assemblies and institutions like the two churches identified in the amended complaint are not valid comparators in an Equal Terms challenge.

(Doc. 40 at 11.)  The Equal Terms provision states that the government cannot treat "a religious assembly or institution on less than equal terms with <u>a nonreligious</u> assembly or institution." 42 U.S.C. § 2000cc(b)(1) (emphasis added); <u>see</u> <u>Primera</u>, 540 F.3d at 1314 n.13 (noting that proof of "the secularity of its comparator assembly" is "unquestionably required to support an Equal Terms claim").

As for the two schools that received CUPs, the City does not dispute that they qualify as assemblies or institutions under RLUIPA (<u>see</u> Doc. 40 at 11).  True, there is not much information in either the amended complaint or its exhibits to indicate that the schools are "similarly situated," beyond that the two applicants sought and received CUPs to operate schools on property zoned RS-1.[11]  At this stage, however, the allegations in the amended complaint are enough to move forward with the Church's as-applied Equal Terms challenge.

### 3.    The Nondiscrimination Provision

Count IV of the amended complaint purports to bring a claim under § (b)(2) of RLUIPA, the Nondiscrimation provision.    This provision prohibits land use regulations "that discriminate against any assembly or institution <u>on the basis of religion or religious denomination</u>." 42 U.S.C. § 2000cc(b)(2) (emphasis added).  As with the Equal Terms provision, a government can violate the Nondiscrimination provision with a facially discriminatory statute, a facially neutral statute gerrymandered to discriminate, or a truly neutral statute selectively enforced to

---

[11] The record in this case also contains additional materials from the schools' applications from briefing in the Church's earlier motion for preliminary injunction. (<u>See</u> Docs. 13-11, 13-12, 13-13, 13-14.)

discriminate.  Primera, 450 F.3d 1295 at 1308.  To prove a "selective enforcement" claim, the plaintiff bears the burden of showing "(1) that it was treated differently from other similarly situated religious assemblies or institutions, and (2) that the City unequally applied a facially neutral ordinance *for the purpose of discriminating against Plaintiff*."  Church of Scientology of Ga., Inc. v. City of Sandy Springs, 843 F. Supp. 2d 1328, 1361-62 (N.D. Ga. 2012) (emphasis added) (citing Campbell v. Rainbow City, 434 F.3d 1306, 1314 (11th Cir. 2006)); see 42 U.S.C. § 2000cc-2(b).

In the amended complaint, the Church alleges that the City discriminated against it on the basis of its denomination (Anglican) by denying its CUP application but granting the applications of two churches of two different denominations (Lutheran and nondenominational).  (Doc. 32 at ¶¶ 92-96.)

The City contends that the amended complaint fails to allege that the two other churches "were of a different religious denomination in any significant sense," that the circumstances of their applications were sufficiently similar to the Church's, and that the alleged discrimination was done purposefully.  (Doc. 40 at 13.)  The City contends the other churches were not even treated differently than the Church because all three went through the same CUP process.  (Doc. 40 at 13.)

The Court finds that the issue of whether these churches were similarly situated but treated differently are factual issues for resolution at trial.

The Church has not pleaded, however, that the City had any discriminatory purpose in denying the Church's CUP applications.  Moreover, the amended complaint attaches the planning commission hearing minutes and findings of fact (which control

over any conclusory allegations in the amended complaint), which do not include any suggestion of a discriminatory purpose.  (See Doc. 32, Exs. 13, 16, 18.)  The Church's response to the motion to dismiss does not direct the Court to anywhere in these records or any other document from which the Court might reasonably infer that the Church's applications were denied on the basis of religious discrimination.  While the Court is dubious that the Church will be able to prove this claim, the Court elects to make a final decision after hearing evidence at trial.[12]

### 4.  The Unreasonable Limitations Provision

The Unreasonable Limitations provision prohibits the imposition or implementation of a land use regulation that "unreasonably limits religious assemblies, institutions, or structures within a jurisdiction."  42 U.S.C. § 2000cc(b)(3)(B).  This provision "prevents government from adopting policies that make it difficult for religious institutions to locate anywhere within the jurisdiction."  Bethel World Outreach Ministries v. Montgomery Cnty. Council, 706 F.3d 548, 560 (4th Cir. 2013) (citing Vision Church v. Vill. of Long Grove, 468 F.3d 975, 990-92 (7th Cir. 2006)).  "[T]he purpose of this provision is not to examine restrictions placed on individual landowners, but to prevent municipalities from broadly limiting where religious entities can locate."  Church of Scientology of Ga., Inc. v. City of Sandy Springs, Ga., 843 F. Supp. 2d 1328, 1377 (N.D. Ga. 2012) (citing Adhi Parasakthi Charitable, Med., Educ., & Cultural Soc'y of N. Am. v. Twp. of West Pikeland, 721 F.

---

[12] Because the Court has agreed to expedite this case for trial, the Court will not direct the Church to file a second amended complaint to address this pleading deficiency.

Supp. 2d 361, 387 (E.D. Pa. 2010) and <u>Rocky Mountain Christian Church v. Bd. Of Cnty. Comm'rs</u>, 613 F.3d 1229, 1238 (10th Cir. 2010)).  The clear implication of the language of § (b)(3)(B) is that a government could *reasonably* limit religious organizations in a way that does not run afoul of this provision.  The Southern District of Florida, following the Seventh Circuit's opinion in <u>Vision Church</u>, has held that "'what is reasonable must be determined in light of all the facts, including the actual availability of land and the economics of religious organizations.'"  <u>Chabad of Nova, Inc. v. City of Cooper City</u>, 575 F. Supp. 2d 1280, 1289 (S.D. Fla. 2008) (quoting <u>Vision Church</u>, 468 F.3d at 990).

Count V of the amended complaint purports to bring an as-applied challenge under the Unreasonable Limitations provision, alleging that the City's denial of a CUP, along with the lack of other available land, has worked an unreasonable limitation on the Church.  (Doc. 32 at ¶¶ 102-104.)  Both parties, however, wisely present arguments in their briefs that focus on the language of the LDC rather than its application to the Church.

The motion to dismiss argues that the LDC permits the Church and other religious organizations to operate on RS-1 property with a CUP, a minor limitation that many nonreligious organizations must deal with as well.  (Doc. 40 at 13-14.)  In addition to the zones where religious organizations may operate with a permit, there are two commercial districts where they may operate as of right.  (<u>Id.</u> at 14.)  The City does not view either limitation as unreasonable.  (<u>Id.</u>)

According to the Church's analysis of the city zoning map, out of the

approximately fifty districts that bear one of the thirteen zoning classifications, religious organizations are allowed as of right in only five districts.  (Doc. 41 at 13.) The Church views this as an unreasonable limitation on religious organizations.

The amended complaint here alleges in rather conclusory fashion that the Property at issue is the Church's ideal location, and there is no other location exactly like it.  The complaint provides little information about the availability of other land or how the LDC's restrictions, rather than the Church's self-imposed constraints, have unreasonably limited the Church's ability to find a permanent location in Jacksonville Beach.  Based on Eleventh Circuit precedent, the Court is skeptical of this claim as well, but will allow the Church to proceed to trial.

###### C.      Sanctions under 28 U.S.C. § 1927

Finally, the Court declines to enter sanctions against the City's attorneys for filing the motion to dismiss; frankly, the Court is surprised that the Church made the request.  First, as mentioned above, a response to a motion to dismiss is not the appropriate vehicle for requesting affirmative relief like the imposition of sanctions. Yet, the Church even opposed giving the City a chance to respond to the request for sanctions in a reply brief.  (Doc. 45.)

Second, and more substantively, sanctions under 28 U.S.C. § 1927 require "(1) an attorney must engage in 'unreasonable and vexatious' conduct; (2) such 'unreasonable and vexatious' conduct must 'multipl[y] the proceedings;' and (3) the amount of the sanction cannot exceed the costs occasioned by the objectionable conduct."  Norelus v. Denny's, Inc., 628 F.3d 1270, 1281 (11th Cir. 2010) (citing

McMahan v. Toto, 256 F.3d 1120, 1128 (11th Cir. 2001)).  "Unreasonable and vexatious conduct" is more than just a lack of merit," McMahan, 256 F.3d at 1129, but must be "so egregious that it 'is tantamount to bad faith,'" Peer v. Lewis, 606 F.3d 1306, 1314 (11th Cir. 2010) (quoting Avirgan v. Hull, 932 F.2d 1572, 1582 (11th Cir. 1991)).

As discussed herein, the City's positions are certainly not taken in bad faith. Moreover, the motion to dismiss can hardly be said to have multiplied the proceedings when the Court set a briefing schedule for it before the Church filed the amended complaint (2/19/14 Order, Doc. 28).  For all these reasons, the Court declines to enter the sanctions requested by the Church.

## IV.   CONCLUSION

The Court has undertaken in this Order a close review of the allegations in the amended complaint and the applicable law in an effort to provide the parties guidance as they prepare for trial.  Still, the Court reminds the parties that this is only a ruling on a motion to dismiss and the Court will not finalize its decision until it has heard the evidence and applied the law to the facts.  Thus, any views expressed by the Court in this Order should be regarded as tentative.

Accordingly, it is hereby **ORDERED** that Defendant's Motion to Dismiss Plaintiff's Amended Complaint (Doc. 40) is **DENIED**.  The City shall file its answer to the First Amended Complaint (Doc. 32) on or before **August 8, 2014**.

**DONE AND ORDERED** at Jacksonville, Florida this 18th day of July, 2014.

TIMOTHY J. CORRIGAN
United States District Judge

bjb
Copies to:

Counsel of record