**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

CHURCH OF OUR SAVIOR, formerly
known as Resurrection Anglican
Church, Inc., a Florida Nonprofit
Corporation,

        Plaintiff,

v.                                        Case No. 3:13-cv-1346-J-32JBT

THE CITY OF JACKSONVILLE
BEACH, a Florida Municipal
Corporation,

        Defendant.

_____

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

      This dispute lies at the intersection of a church's right to practice its religion and a local government's power to regulate land use. Plaintiff Church of Our Savior challenges Defendant City of Jacksonville Beach's denial of the Church's request for a conditional use permit to build a church on property zoned residential. This case is brought under three provisions of the federal Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc.

      At the Church's request and with good cause, the Court expedited the case for trial before the Court on September 17 and 18, 2014.[1] (Docs. 99, 100.) Following trial,

_____

[1] Before trial, the City filed a combined motion for summary judgment and trial brief (Doc. 59) and later a combined supplemental motion for summary judgment and trial brief (Doc. 95). The Church filed a response to the initial motion and trial brief. (Doc. 66.) The Court advised the parties it would carry the filings with the case and

the parties submitted proposed findings of fact and conclusions of law. (Docs. 107, 110.) The Court heard final argument on November 10, 2014. (Doc. 115.) The case is now ready for decision. Fed. R. Civ. P. 52(a).[2]

I.      **FACTS**

        A.      **The Church of Our Savior**

        The Church of Our Savior began its existence in 2006 as Resurrection Anglican Church, which itself formed from a Bible study at St. Paul's by-the-Sea Episcopal Church in Jacksonville Beach, Florida. (Trial Tr. vol. 1, 19, Sept. 17, 2014, Doc. 104.) In 2013, Resurrection Anglican Church came together with Calvary Anglican Church to form one congregation known as the Church of Our Savior. (Doc. 104 at 19-21; Trial Tr. vol. 2, 11-12, Sept. 18, 2014, Doc. 105.) The Church is the only Anglican church in Jacksonville Beach and the surrounding seaside communities of Atlantic Beach, Neptune Beach, and Ponte Vedra Beach. (Doc. 104 at 35.)

        Since its founding, the Church has worshipped at six separate facilities. (Id. at 19-20.) The Church currently holds services at the Beaches Museum Chapel in Jacksonville Beach. (Id. at 20, 23.) The Beaches Museum Chapel is a historic chapel owned by the Beaches Area Historical Society. (Id. at 24; see Pl.'s Ex. 5.) After unsuccessfully attempting to reach a longer term agreement with the Historical

---

view them as the parties' trial briefs. (See Doc. 104 at 6-7.)

        [2] The Court conditionally admitted certain evidence at trial subject to further consideration in reaching its findings of fact and conclusions of law. The findings and conclusions set forth herein do not include any evidence the Court has rejected as irrelevant, unreliable, or otherwise inadmissible. Moreover, while the Court has adopted portions of each party's submission, the Court's findings of fact and conclusions of law are the result of its own independent review.

Society in 2011 and having to use a different location, the Church eventually signed a three-month lease for the Chapel. (Doc. 104 at 25-27; Pl.'s Exs. 4-6.) The lease has no automatic renewal provision. It allows the Church to use the Chapel for worship and two adjacent buildings for nursery and children's Sunday school for four hours on Sunday mornings and gives the Church priority for major religious holidays, like Ash Wednesday, Easter week, and Christmas Eve. (Pl.'s Ex. 6; see Doc. 104 at 27-28.) The Chapel may also be rented for other church events not traditionally performed on Sundays, like weddings, baptisms, and Bible studies, but the Church first needs to check with the Historical Society to make sure it is available (Doc. 104 at 28-29; Pl.'s Ex. 6.) Presently, no other church regularly uses the Chapel. (Doc. 104 at 51.)

The Church views the Chapel building as less than ideal due to its limited storage space and signage and its maximum capacity of 140 people. (Doc. 104 at 29-31; Doc. 105 at 17; Pl.'s Ex. 5.) The Church suggests the *comfortable* capacity of the Chapel is actually no more than 100 people. (Doc. 105 at 51-52.) On top of that, Church experience suggests that occupying more than 80% of a facility's capacity during services inhibits further membership growth. (Id. at 15.) With an average Sunday attendance of approximately 100 people, the Church moved to two Sunday services in 2013. (Id. at 14-15, 51; Pl.'s Ex. 3.[3]) The Church contends without dispute that these time and space limitations constrain its ability to grow and to fully exercise its religion

---

[3] The parties' exhibit lists contained many of the same exhibits; as a result, many exhibits were admitted at trial twice. (Compare Doc. 101 with Doc. 102.) Where the exhibits are substantially identical, and unless otherwise necessary, the Court refers to only the number on the Church's exhibit list.

by performing its sacraments and worshipping together in one service. (Doc. 105 at 15-16; see Doc. 104 at 31-32.)

### B. The Property

Even before it became the Church of Our Savior, the Church had hoped to own its building on its own property. (Doc. 104 at 33-34.) The Church identified three main search criteria drawn from circumstances and its religious beliefs and traditions: affordability, visibility (or "identifiability"), and accessibility. (Doc. 104 at 34-36; Doc. 105 at 22-24.) On affordability—the "number one" criteria—the Church's budget was $300,000 to $500,000, though it would need seller financing for that amount. (Doc. 104 at 34, 36.) As to visibility, the Church wanted an "attractive" church on a main thoroughfare that a passerby would recognize as a church. (Id. at 37-38, 109-10). The Church was open to refurbishing a building, as well as building new. (Doc. 105 at 52.) As for accessibility, the building itself needed to be physically accessible, but also centrally located in the Jacksonville Beach, Neptune Beach, Atlantic Beach, and Ponte Vedra Beach area, and on the east side of the intracoastal waterway. (Doc. 104 at 88-89; Doc. 105 at 24-25, 43-44.) The Church did not hire a professional real estate broker, but relied on one of its leaders, a retired real estate agent, and the rest of its members to be on the lookout for suitable property. (Doc. 104 at 38-40; Doc. 105 at 22-23.)

During this informal but persistent search, the Church's pastor, Reverend David Ball, identified vacant land for sale along Beach Boulevard (the "Property"), just east of the intracoastal waterway, that might meet the Church's three criteria. (Doc. 104 at 42-43; Doc. 105 at 30-31.) As depicted on the satellite image below, the Property

actually consists of three parcels currently owned by two different owners[4] and separated by a City-owned sewer lift station. (Doc. 105 at 130-31; Pl.'s Exs. 7, 11.)



(Def.'s Ex. 32.[5]) The total acreage of the Property is unclear in the record, with some support for a total of 1.34 acres, 1.62 acres, or 1.7 acres. (Pl.'s Ex. 10; Pl.'s Ex. 11 at 6; Pl.'s Ex. 18 at 2.) To the north of the Property is Beach Boulevard, a six-lane highway

---

[4] The county appraiser's office lists the parcel in yellow in the image above as Real Estate Number 177295-0000, owned by the Duval County Land Trust, and lists the parcels in red together as Real Estate Number 177279-0005, owned by George M. Goodloe. (Pl.'s Exs. 7, 11, 45.)

[5] The Court uses this exhibit for illustrative purposes only.

with commercial property on its north side. (Doc. 104 at 46.) The Property is accessed from the north via a frontage road along Beach Boulevard. (Doc. 105 at 72-73.) Immediately to the east of the Property is a drainage ditch and a grass and gravel overflow parking lot for Adventure Landing amusement park, which is on the other side of the parking lot and is the nearest structure to the east of the Property.[6] (Doc. 104 at 46-47.) To the west and south of the Property is a small neighborhood of houses along Hopson Road, which curves south, southeast off of the frontage road.[7] (Id. at 47.)

## C.   The Jacksonville Beach Land Development Code

The Property is currently zoned "Residential, single family (RS-1)" under the Jacksonville Beach Land Development Code ("LDC"). (Pretrial Statement 9, Doc. 72.) RS-1 is one of thirteen zoning districts established in the LDC "to ensure that each permitted and conditional use is compatible with surrounding land uses, served by adequate public facilities, and sensitive to natural and coastal resources." LDC Secs. 34-321, -322.[8] The City's Comprehensive Plan calls for its land use regulations to include a classification for "Low Density Residential" of "[n]ot more than six (6) units per acre." (Pl.'s Ex. 21 at COJB 00000266.) The RS-1 zoning district "implement[s] the low density residential land use district in the comprehensive plan" and "is intended

---

[6] Reverend Ball actually first thought the overflow parking lot was the property available for sale, until the Church inquired and learned that the parcels next to it were the ones for sale. (Doc. 105 at 31.)

[7] With the parties' approval and attendance, the Court visited and walked around on the site on August 26, 2014. (Doc. 104 at 9-10, 15-16.)

[8] Each party included a copy of the LDC as it existed before September 15, 2014 with its exhibits. (Docs. 101, 102.) For ease of reference, the Court will cite to the LDC by code section rather than exhibit number and page.

to classify areas suitable for low density single-family residential development." LDC Sec. 34-336. The Comprehensive Plan further provides that "future institutional uses (schools, churches, government buildings, fraternal groups, cemeteries, and health and public safety facilities) . . . shall be located outside of areas proposed for low-density residential use . . . ." (Pl.'s Ex. 21 at COJB 00000266.)

Each zoning district in the LDC, including RS-1, has certain "permitted uses" and "uses accessory to permitted uses" that are allowed in the district as of right and certain "conditional uses" that may be allowed upon submission of an application for a Conditional Use Permit ("CUP") and the review and approval of the Planning and Development Director and the Planning Commission. LDC Secs. 34-41, -221 to -236, -321. For most of the relevant period, until September 15, 2014, "[s]ingle family dwellings," "[p]ublic and private parks, playgrounds and recreational facilities," and "Type I home occupation"[9] uses were permitted as of right on property zoned RS-1. LDC Sec. 34-336(b). Permitted private parks, playgrounds and recreational facilities could not be for commercial use, however, and were restricted to "the sole use of residents living in the area where such facilities are located . . . ." Id. at (b)(2). Conditional uses on property zoned RS-1 included, among other things, "[r]eligious organizations" and "[p]ublic and private elementary and secondary schools and technical institutes, excluding trades schools and vocational schools." Id. at (d).

"*Religious organization* means a structure or place in which worship, ceremonies, rituals, and education pertaining to a particular system of beliefs are

---

[9] "Type I home occupation" generally means a home office.  LDC Sec. 34-41.

held." LDC Sec. 34-41. Out of the City's thirteen zoning districts, religious organizations are conditional uses in all five residential zones (RS-1, RS-2, RS-3, RM-1, and RM-2) and three of the five commercial zones (CPO, CS, CBD), are permitted as of right in the other two commercial zones (C-1, C-2), and are not permitted at all in the City's industrial zone (I-1), redevelopment district (RD), or planned unit development district (PUD). LDC Secs. 34-336 to -348. There are presently nineteen properties within Jacksonville Beach city limits that are identified as churches in the Duval County Property Appraiser's data and the City's geographic information system. (Doc. 105 at 168.) Most of the churches are in zones where they are permitted as of right, while others are in zones where they would require a CUP, though they were likely established before the LDC required a CUP. (Id. at 165, 167.)

Uses listed as conditional in a particular zoning district are eligible for a CUP, but are not guaranteed to receive one. LDC Sec. 34-223. Instead, the Planning and Development Director and the Planning Commission are supposed to evaluate each application for CUP based on a set of eleven general standards and the standards of the particular zone in which the CUP is requested. Id.; see LDC Sec. 34-231. To receive a CUP, the property owner or someone else with an interest in the property (or their agent) submits an application with certain required information to the Planning and Development Director. LDC Secs. 34-225, 226. The Director (or his staff) reviews the application for initial sufficiency, prepares a report on the application, and schedules the application for a public hearing before the Planning Commission. LDC Secs. 34-227 to -229. At the hearing, the Planning Commission reviews the application and the

8

Director's report as well as any public testimony, and then issues an order approving the application, approving it with conditions, or denying it. LDC Sec. 34-230. The LDC does not include any review mechanism where the applicant can appeal the Commission's ruling to the full City Council or some other city body.[10]

### D.     The First CUP Application

Because it would need a CUP to operate on the Property, the Church retained Fred Atwill, a consultant with municipal land use, zoning, and planning experience, to serve as its liaison with the City and assist the Church in preparing and presenting its CUP request. (Doc. 104 at 174, 178-79, 186-94.) The Church also retained architect Michael Bruce to prepare a site plan for use in the CUP application. (Doc. 104 at 122-23). Bruce developed a site plan based on the Church's needs and the site's compatibility. (See Pl.'s Exs. 23-25.) For instance, Reverend Ball informed Bruce that the Church wanted the building to have a sanctuary with a 250-person capacity to comfortably accommodate 200 attendees, various administrative offices, a fellowship hall, nursery space, and classrooms. (Pl.'s Ex. 23.) Bruce's preliminary work determined the project would require a 9,500 square-foot building, but that the site, with the required parking and setback, would fit only a 7,440 square-foot building. (Pl.'s Ex. 25.) Bruce expressed concern about the Property's size, limited room for growth, and other potential site issues (Doc. 104 at 128-29; Pl.'s Exs. 25, 27), but the Church's goal was to limit its membership to 200 at this site and, as necessary, expand

---

[10] A disappointed applicant can seek <u>certiorari</u> review of the Planning Commission decision in state court. The Church chose not to do so here, instead filing suit in federal court under RLUIPA.

by "planting" new churches on other sites. (Doc. 105 at 18-19; Pl.'s Ex. 28.) Bruce then prepared a few preliminary site plans (Pl.'s Ex. 26), ultimately arriving at the preliminary plan below:



(Def.'s Ex. 4 at 7.) Bruce placed the building on the easternmost portion of the Property to achieve visibility from Beach Boulevard and to provide the maximum buffer from the Hopson Road neighborhood. (Doc. 104 at 132, 196.)  The Church next moved to obtaining City approval to build a church on the property. (See id. at 128-30.)

On March 8, 2013, the Church submitted a CUP application to the City's Planning and Development Department. (Pl.'s Ex. 29). William Mann, city planner for

the City, prepared a report recommending the application be approved. (Pl.'s Ex. 35; Doc. 105 at 69.) Mann detailed in the report the Church's proposal and its interaction with the Department. (Pl.'s Ex. 35) He also noted that the Property is divided by the City-owned sewer lift station and that the Public Works Department was aware of the Church's plans and indicated that the plans would not interfere with maintenance of the lift station. (Id.) The report noted the current owner of one of the parcels making up the Property had approached the Department several times to develop the parcel for commercial use, but had been advised that would not be supported as it was not consistent with the Comprehensive Plan. (Id.) Mann concluded in the report that, by contrast, the Church's proposal "is contemplated in RS-1 zoning," "is not inconsistent" with the designation of the Property as "Residential – Low Density" in the Comprehensive Plan, "represents a reasonable low intensity use of the undeveloped parcels surrounding the City's lift station, and would serve as transition between the soon to be developed commercial parking facilities to the east, and the Hopson Road neighborhood to the west and south." (Id. at 2.) At trial, Mann stood by his recommendation and agreed that the Church's proposal met the City's parking requirements and did not cause him concerns about traffic or noise. (Doc. 105 at 70, 74.) As the Church understood at the time of its application, however, the Planning Commission would make the final decision. (Doc. 104 at 93); see LDC Sec. 34-230.

On April 8, 2013, the Commission considered the application at a public hearing. (Pl.'s Exs. 36, 37.) Mann read the department report into the hearing record, and Atwill spoke on behalf of the Church and submitted a letter of support from one

11

of the homeowners in the Hopson Road neighborhood. (Pl.'s Ex. 37 at 2-7.) Reverend Ball also spoke about the Church's goals for the Property and answered some questions, as did Bruce. (Id. at 8-10.) Five residents from the Hopson Road neighborhood spoke against the application, objecting primarily over the traffic impact, parking for the building, and the project's density of use. (Id. at 10-15.) Among other things, Commissioner Terry DeLoach expressed concerns over the "Children's Play Area" on the south parcel, the plan for main structure, the close proximity of the project to the surrounding homes, the project's potential impact on property values, and its consistency with the neighborhood. (Id. at 19-21, 23, 28.) Ball, Bruce, and Atwill responded to the concerns expressed by the neighbors and the Commission (id. at 15-24), and Mann answered some questions about access to the City's sewer lift station and the RS-1 zoning district (id. at 24-28). No concerns were expressed regarding the religious aspects of the proposed use in particular. At the close of the hearing, Commissioner DeLoach reiterated his concern about the consistency of the Church's proposal with the character of the neighborhood and the effect on property values and moved to deny the application. (Id. at 28.) The Commission unanimously voted in favor of denial. (Id. at 28-29.)

### E.    The Second CUP Application

Following the denial, the Church conferred with Planning and Development Department staff and, on August 7, 2013, submitted a second application. (Pl.'s Ex. 39.) The second application re-designated the play area on the south parcel as a public park so as to constitute a "material difference" to allow the matter to be brought back before the Planning Commission sooner than ordinarily allowed under the LDC. (Pl.'s

Ex. 45 at 2; Def.'s Ex. 4 at 2); see LDC Sec. 34-158. In between the two applications, the Church had also mailed letters to residents of the Hopson Road neighborhood seeking support for the proposal. (Pl.'s Ex. 47 at 7; see, e.g., Pl.'s Ex. 41.) The Planning and Development Department prepared a report on the new application, noting that the reduction in lot size due to the reclassification of the south parcel would likely require the Church to obtain a variance to exceed the maximum lot coverage. (Pl.'s Ex. 45.) But the Department again recommended approval without condition, repeating the conclusion from its report on the first application verbatim. (Id.)

On September 9, 2013, the Commission considered the second application at a public hearing. (Pl.'s Exs. 46, 47.) Mann read the second department report into the record. (Pl.'s Ex. 47 at 2-6.) A representative of the Church made a presentation, highlighting the change to the designation of the southern parcel and the Church's intention to stay small and be respectful of the community, and answered questions from the Commission. (Id. at 6-11.) Atwill then spoke in favor of the Church. (Id. at 11-12.) This time, thirteen Hopson Road residents spoke against the application, expressing largely the same concerns. (Id. at 13-32.) Mann answered some questions about the Property's zoning and egress from the Property. (Id. at 16-18, 22-23, 32-33.) The Church representative provided rebuttal to some of comments of the residents and answered other questions from the commissioners. (Id. at 34-41.) Commissioner DeLoach again expressed concerns about the Church fitting into the area, its potential growth beyond the current site plan, and its effect on property values. (Id. at 38-39.) The owner of one of the parcels making up the Property also spoke in favor of the

proposal as the best use for the land as it is currently zoned. (Id. at 41-42.) At the conclusion of the hearing, Commissioner Georgette Dumont moved for approval of the application with the condition that the Church must follow the site plan submitted with the application. (Id. at 43.) The Commission, including the movant, Commissioner Dumont, unanimously voted against the motion and denied the second application.[11] (Id.; see Pl.'s Ex. 46 at 8.)

After the hearing, Mann drafted Findings of Fact identifying three reasons for denial: (1) "[b]ased on public testimony from the Hopson Road neighborhood residents, the proposal "is not consistent with the character of the immediate vicinity;" (2) the proposal is "inconsistent" with the City's Comprehensive Plan, which requires future institutional uses, like churches, to be located outside of low-density residential areas; and (3) changing the designation of the children's play area to a public park meant the proposed building would exceed the maximum of 35% lot coverage for property zoned RS-1.[12] (Pl.'s Ex. 49; see Doc. 105 at 83.) On September 23, 2013, the Commission approved the Findings of Fact. (Def.'s Ex. 8 at 16-17.) The Planning and Development Department does not usually prepare findings of fact for each CUP application, but only when an application has been denied and particularly when there is a likelihood

---

[11] Planning and Development Director Steven Lindorff testified at trial that, during his nearly thirty years with the Planning and Development Department, the Planning Commission had perhaps only once denied a CUP application twice where the Department had twice recommended approval. (Doc. 105 at 145-46.)

[12] At trial, Mann reconciled the Findings of Fact supporting denial with the two Department reports he had authored recommending approval by noting that, even though churches in general are conditional uses in RS-1 and so not necessarily inconsistent with the Comprehensive Plan, the Planning Commission's decision effectively ruled that the Church's proposal is inconsistent in this instance. (Id. at 120.)

of litigation. (Doc. 105 at 83, 144.)

The Church did not file any petition in Florida state court to review the Commission's determinations. The Church did, however, enter into option agreements for the parcels making up the Property on October 25, 2013 to establish standing to file this lawsuit. (Doc. 104 at 54.) If timely closed, the total purchase price for all the parcels would be $450,000, most of it seller-financed. (Pl.'s Exs. 7, 11.)

## F.    The 2014 Amendment

Two days before trial began on September 17, 2014, the City amended the LDC. On September 15, 2014, after having held a first public reading on September 2, 2014, the City Council passed Ordinance No. 2014-8060, an amendment to the LDC that "would require parks in residential zones to make application to the Planning Commission for approval as a conditional use." (Pl.'s Ex. 59.) Under the ordinance (the "2014 Amendment"), section 34-336 of the LDC now includes only "[s]ingle-family dwellings" and "Type I home occupation" as permitted uses on RS-1, with "public and private parks, playgrounds and recreational facilities" moved from permitted uses to conditional uses. (Def.'s Ex. 33.[13])

The minutes from the September 2, 2014 City Council meeting reflect comments from the City Attorney that the 2014 Amendment was designed to "ensure compliance

---

[13] The City used Defendant's Exhibit 33, a certified copy of the ordinance, during its examination of Planning and Development Director Lindorff, but never moved to admit the exhibit into evidence. The Court nevertheless takes judicial notice of Defendant's Exhibit 33 pursuant to Federal Rule of Evidence 201. The Church objected to the timing of the ordinance, but has not disputed that the City's Exhibit 33 accurately reflects the ordinance.

with" RLUIPA by "equaliz[ing] the treatment of religious organizations, and public and private parks, playgrounds, and recreational facilities . . . ." (Pl.'s Ex. 59.) Director Lindorff also explained at trial that Jacksonville Beach no longer has open green fields for development where the developer might want to include a park, playground, or recreation center, so there was little need for the LDC to continue to designate parks, playgrounds, and recreation centers as permitted uses as of right in residential zones. (Doc. 105 at 181.) But Lindorff could not recall another time when the LDC had been amended to address a pending lawsuit. (<u>Id.</u> at 186.)

## II.    THE COURT'S DECISION

The Church contends that the City's denial of a CUP and the language of the LDC both violate RLUIPA. (Doc. 107.)  The City disputes that and argues, moreover, that the very recent amendment to the LDC moots the Church's challenge to the language of the LDC. (Doc. 110.)

On July 18, 2014, in an order denying the City's motion to dismiss the Church's amended complaint, the Court closely reviewed the language of RLUIPA and the authority interpreting it in an effort to provide guidance to the parties as they prepared for trial. (July 18, 2014 Order, Doc. 56.) The parties generally agree on the broad strokes of the applicable law. (<u>See</u> Doc. 72 at 9-11, 19.) Still, the number of issues that remain in dispute and the dictates of Federal Rule of Civil Procedure 52(a)(1) compel the Court to fully set forth the controlling law as it endeavors to apply it to the facts of this case.

A key prerequisite is recognizing what law the Court is <u>not</u> being asked to apply.

Florida law permits a CUP applicant to seek judicial review of a local agency's denial of the application via petition for a writ of <u>certiorari</u> in the appropriate Florida state circuit court. <u>Broward Cnty. v. G.B.V. Int'l, Ltd.</u>, 787 So. 2d 838, 842-43 (Fla. 2001). The state court in that instance would be empowered to review the local agency's actions to ensure that due process and the essential requirements of the law were observed and that "the administrative findings and judgment are supported by competent substantial evidence." <u>Florida Power & Light Co. v. City of Dania</u>, 761 So. 2d 1089, 1092 (Fla. 2000) (quotation omitted). By contrast, the Court's license to question the judgment of the Planning Commission here is cabined by the elements of RLUIPA.

## A.  The Religious Land Use and Institutionalized Persons Act (RLUIPA)

RLUIPA supplies the operative limitations on how government land use regulations may intersect with religious exercise:

### (a) Substantial burdens

#### (1) General rule
No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution—

(A) is in furtherance of a compelling governmental interest; and
(B) is the least restrictive means of furthering that compelling governmental interest

. . . .

### (b) Discrimination and exclusion

#### (1) Equal terms

No government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution.

. . . .

**(3) Exclusions and limits**
No government shall impose or implement a land use regulation that—

> (A) totally excludes religious assemblies from a jurisdiction; or
> (B) unreasonably limits religious assemblies, institutions, or structures within a jurisdiction.

42 U.S.C. § 2000cc.[14] As a "rule of construction," RLUIPA itself provides that it "shall be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution." Id. § 2000cc-3(g).

RLUIPA's prohibitions apply to "a State, county, municipality or other governmental entity created under the authority of the State," their branches, departments, agencies, instrumentalities, and officials, and to "any other person acting under color of State law." Id. § 2000cc-5(4). Section 2000cc-2 permits a litigant to assert a RLUIPA violation in a judicial proceeding, as long as it has standing under "the general rules of standing under article III of the Constitution." Id. § 2000cc-2(a).[15]

---

[14] RLUIPA also includes a provision that "No government shall impose or implement a land use regulation that discriminates against any assembly on the basis of religion or religious denomination." Id. § (b)(2). The Church dismissed its claim alleging a violation of this provision. (Docs. 57, 58.)

[15] RLUIPA claims brought under at least § 2000cc(a), the Substantial Burden provision, must meet one of three additional jurisdictional requirements dealing with whether the land use restriction in question (A) is part of a federally-funded program, (B) affects interstate commerce, or (C) involves "individualized assessments of the proposed uses for the property involved." Id. § 2000cc(a)(2). The City does not dispute, and the Court previously held, that subpart (C) is met here.

For claims other than those brought under the Substantial Burden provision, the plaintiff bears the initial burden of producing "prima facie evidence to support a claim alleging . . . a violation of section 2000cc of this title," after which, "the government shall bear the burden of persuasion on any element of the claim . . . ." Id. at (b). For a Substantial Burden claim, "the plaintiff shall bear the burden of persuasion on whether the law (including a regulation) or government practice that is challenged by the claim substantially burdens the plaintiff's exercise of religion." Id.

The Church alleges that the City violated the Substantial Burden, Equal Terms, and Unreasonable Limitations provisions of RLUIPA by denying both of the Church's CUP applications and that, on its face, the LDC violates the Equal Terms provision by allowing certain secular assemblies as of right on property zoned RS-1, but classifying religious assemblies as conditional uses that require a permit. (Doc. 107.) The Church urges the Court to order the City to issue a CUP consistent with the Church's first application and to award attorney's fees and costs. (Id. at 30.) The City disputes that RLUIPA is even the right vehicle for the Church's challenge to the City's actions, but says that, in any event, the City did not violate RLUIPA. (Doc. 110.)

## 1.   **The Substantial Burden Provision**

The Church's first claim challenges the City's denial of its CUP application under section (a) of RLUIPA, the Substantial Burden provision, which provides that a land use restriction may not substantially burden "religious exercise" unless it is "the least restrictive means of furthering a compelling governmental interest." Midrash Sephardi, Inc. v. Town of Surfside, 366 F.3d 1214, 1225 (11th Cir. 2004). "The term 'religious exercise' includes any exercise of religion, whether or not compelled by, or

central to, a system of religious belief," as well as "[t]he use, building, or conversion of real property for the purpose of religious exercise . . . ." 42 U.S.C. § 2000cc-5(7). Under RLUIPA, the court does not delve into "whether the religious exercise implicated by zoning decisions was integral to a believer's faith." <u>Men of Destiny Ministries, Inc. v. Osceola Cnty.</u>, 624-Orl-31DAB, 2006 WL 3219321, at *4 (M.D. Fla. Nov. 6, 2006); <u>see Burwell v. Hobby Lobby Stores, Inc.</u>, 134 S. Ct. 2751, 2778 (2014).

RLUIPA does not define "substantial burden," but the Eleventh Circuit has held that:

> a "substantial burden" must place more than an inconvenience on religious exercise; a "substantial burden" is akin to significant pressure which directly coerces the religious adherent to conform his or her behavior accordingly.  Thus, a substantial burden can result from pressure that tends to force adherents to forego religious precepts or from pressure that mandates religious conduct.

<u>Midrash</u>, 366 F.3d at 1227 (11th Cir. 2004). "To invoke the protection of § (a) of RLUIPA, plaintiffs bear the burden of first demonstrating that the regulation substantially burdens religious exercise." <u>Id.</u> at 1225 (citing 42 U.S.C. § 2000cc-2(b)). If a plaintiff meets this burden, the government must then demonstrate "that the imposition of the burden . . . is in furtherance of a compelling governmental interest; and is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc(a)(1).

The Church believes that the evidence at trial showed that the denial of a CUP has left the Church unable to use the Property for any religious purpose, leaving the Church at the Beaches Museum Chapel where its ability to fully practice its religion is restricted. (Doc. 107 at 12-14.) The Church feels called by its religion to this

particular Property, with no other property in Jacksonville Beach meeting its affordability, visibility, and accessibility criteria. (Id. at 15-17.) The Church argues that the City has not identified, let alone argued, any compelling interest in denying the CUP application without employing less restrictive means such as imposing conditions on the permit that might address the concerns of the residents of Hopson Road.[16] (Id. at 14, 18-19.)

In the City's view, its actions have not forced the Church to forego its religious precepts, just the ability to develop land of its choosing, a consideration not protected by the Substantial Burden provision. (Doc. 110 at 15.) According to the City, other properties are available that meet the Church's religious needs, but just not its budget. (Id. at 16-17.) The Church is also free to continue its services at the Beaches Museum Chapel. (Id. at 17-18.) The City says the Chapel's limitations are not due to any actions of the City. (Id. at 17-18.)

The Eleventh Circuit has stated that "'run of the mill' zoning considerations" like "[r]equiring churches and synagogues to apply for CUPs" do not amount to a substantial burden. Midrash, 366 F.3d at 1227 n.11; see Konikov v. Orange Cnty., Fla.,

---

[16] The Church also argues that the Planning Commission violated the Substantial Burden provision by acting unreasonably on the Church's CUP application in light of its long track record of following the recommendations of the Planning and Development Department. (Doc. 107 at 17.) Though a government could conceivably impose a substantial burden by subjecting the CUP applications of religious organizations to greater or different scrutiny than other applications, the Court will address this argument to the extent necessary with respect to the Church's Equal Terms and Unreasonable Limitations claims. See Midrash, 366 F.3d at 1229 (indicating that the Substantial Burden provision is "operatively independent" of the other provisions of RLUIPA).

410 F.3d 1317, 1323-24 (11th Cir. 2005). "That the [religious organization] may be unable to find suitable alternative space does not create a substantial burden within the meaning of RLUIPA." Midrash, 366 F.3d at 1227 n.11. RLUIPA does not relieve religious organizations from "'the harsh reality of the marketplace [that] sometimes dictates that certain facilities are not available to those who desire them.'" Id. (quoting Love Church v. City of Evanston, 896 F.2d 1082, 1086 (7th Cir. 1990)).

A logical corollary of the principle that requiring a church to apply for a CUP does not impose a substantial burden is that the denial of a CUP does not operate per se as a substantial burden. See Men of Destiny Ministries, Inc. v. Osceola Cnty., No. 6:06-cv-624-Orl-31DAB, 2006 WL 3219321, at *4-5 (M.D. Fla. Nov. 6, 2006) (finding denial of CUP did not impose substantial burden); Williams Island Synagogue, Inc. v. City Aventura, 358 F. Supp. 2d 1207, 1215-16 (S.D. Fla. 2005) (same). Allowing the plaintiff in a RLUIPA case to meet its burden simply by showing that its CUP application had been denied would be to effectively hold that the CUP requirement is always a substantial burden and that religious institutions are exempt from the requirement, propositions the Eleventh Circuit has rejected. Midrash, 366 F.3d at 1227 n.11; see Living Water Church of God v. Charter Twp. of Meridian, 258 F. App'x 729, 736 (6th Cir. 2007) ("If the term 'substantial burden' is not to be read out of the statute, RLUIPA cannot stand for the proposition that a construction plan is immune from a town's zoning ordinance simply because the institution undertaking the construction pursues a religious mission.").

That is not to say that the denial of a CUP could never impose a substantial

burden in violation of RLUIPA. But courts must evaluate the alleged burden and be mindful of whether it is the result of the land use regulation in question or "the harsh reality of the marketplace" faced by all those who seek to own or rent land. <u>See</u> <u>Midrash</u>, 366 F.3d at 1227 n.11.

In its order denying the City's motion to dismiss the amended complaint, the Court reviewed in some detail Judge Presnell's ruling in <u>Men of Destiny Ministries,</u> <u>Inc. v. Osceola County</u>, No. 6:06-cv-624-Orl-31DAB, 2006 WL 3219321 (M.D. Fla. Nov. 6, 2006) and suggested that the Court would likely revisit the ruling after trial. (Doc. 56 at 14-16.) The Court does so now with the benefit of a complete record.

In <u>Men of Destiny Ministries</u>, the plaintiff had begun renovations to property in Osceola County to operate a Christian drug and alcohol rehabilitation program. 2006 WL 3219321 at *1-2. The property was zoned, however, such that plaintiff would need a CUP to operate the seven-to-fourteen-person residential facility it had planned. <u>Id.</u> at *2. When the renovations came to the county's attention, it cited plaintiff for a number of building permit violations and for not having a CUP. <u>Id.</u> Plaintiff addressed the building permit violations and then applied for a CUP. <u>Id.</u> Staff members of the planning commission recommended the application be approved with conditions. <u>Id.</u> But when the planning commission itself convened to vote on the application, plaintiff's neighbors spoke against the application, and the planning commission voted 6-2 to deny it. <u>Id.</u> at *3. The application then went to the full county commission for a final decision, where the vote was 4-0 to deny the CUP and give the plaintiff forty-five days to relocate. <u>Id.</u> The plaintiff filed suit against the county on a

number of grounds, including alleged violation of the Substantial Burden provision. Id. at *1, 4.

Judge Presnell found that the county's denial of the plaintiff's CUP did not impose a substantial burden, relying largely on the Eleventh Circuit's opinion in Midrash. Id. at *5. Judge Presnell noted that there was no allegation that the plaintiff could exercise its religion only on the property in question or only through its planned residential facility, so it was free to alter its facility or to relocate where it might operate as of right. Id. "[Plaintiff] may believe that other locations or other methods would be less convenient or less effective, but so long as other locations and methods are reasonably available, Osceola County has not imposed a substantial burden on [plaintiff's] religious exercise." Id.

The Church contends that this case differs from Men of Destiny Ministries because "the Property is the *only* location in the City that allows the Church to fully exercise its religious beliefs." (Doc. 107 at 17.) However, the evidence neither supports such a broad statement nor implicates the City in causing that supposed limitation.

Reverend Ball testified that the Church feels a divine calling and religious necessity to own the Property and build a stand-alone church on it. (Doc. 105 at 34, 40.) Accepting these beliefs as sincerely held, the City's refusal to issue a CUP, even one with conditions, does impact the Church's ability to use the Property for its religious purposes. (See id. at 40-41.) But just as in Men of Destiny Ministries, the City's denial of the Church's CUP application does not prevent the Church from relocating to property in any of the zones where it might operate as of right or where

its application for CUP might meet with more success. (See Pl.'s Ex. 19); LDC Secs. 34-336 to -348. Churches are permitted as of right along nearly all of Beach Boulevard and much of Third Street (A1A), the main thoroughfares in Jacksonville Beach. (Pl.'s Ex. 19.) Reverend Ball acknowledged that the Church's search did find properties that met its needs for accessibility and visibility, but were disqualified by their price.[17] (Doc. 105 at 49.)

The overwhelming balance of the evidence shows that affordability was the primary reason the Church has locked onto the Property as its desired location. However, that other suitable land is not available in Jacksonville Beach at a price the Church can afford is a burden imposed by the market, not one the City created by denying the Church a CUP. Midrash, 366 F.3d at 1227 n.11 ("[W]hatever specific difficulties the plaintiff church claims to have encountered, they are the same ones that face all land users, not merely churches." (quotation omitted).) RLUIPA does not authorize the Court to relieve the Church of such an impediment.

Moreover, the Court cannot find from the evidence that the City's refusal to grant a CUP imposed a substantial burden on the Church by forcing it to continue holding its services at the Beaches Museum Chapel. Reverend Ball did testify as to

---

[17] The Court conditionally admitted the testimony of Kate Clifford, a local real estate broker, who testified for the City regarding other potentially suitable properties for sale at the time the Church found the Property. (Doc. 105 at 208-225.) The specifics of this testimony, to which the Church objects, are largely unhelpful and have not been considered in reaching the findings and conclusions here. See Fed. R. Evid. 702. The Court does credit, however, Clifford's uncontroversial testimony that other property is available in Jacksonville Beach, but that it would be difficult to find property that the Church could afford. (Doc. 105 at 243.)

the limitations of the Chapel building and their impact on the Church's ability to hold its traditional Sunday services and other events. (See, e.g., Doc. 105 at 14-18.) But he also agreed that the Church can use the Chapel for its special functions as long as it is available and the rate is affordable, and acknowledged other accommodations to which the Church and the Historical Society have agreed. (See, e.g., id. at 16-17, 50-51.) Undoubtedly, the Beaches Museum Chapel is less convenient and less effective than the Church's proposal for the Property would be. But "a 'substantial burden' must place more than an inconvenience on religious exercise;" instead, it must exert the kind of "pressure that tends to force adherents to forego religious precepts . . . or mandates religious conduct." Midrash, 366 F.3d at 1227. To the extent the City's denials can be said to have prevented the Church from alleviating the deficiencies of its current arrangement, these impediments do not rise to the level of a "substantial burden" prohibited by RLUIPA. See Williams Island Synagogue, Inc. v. City Aventura, 358 F. Supp. 2d 1207, 1215-16 (S.D. Fla. 2005).

Finding that the Church has not proven its Substantial Burden challenge by a preponderance of the evidence, 42 U.S.C. § 2000cc-2(b), the Court does not reach whether denying the Church's request for a CUP constituted "the least restrictive means of furthering [a] compelling governmental interest," id. § 2000cc(a)(1). The Court finds instead that the City is entitled to judgment on Count I of the Amended Complaint.

### 2.    The Equal Terms Provision

The Church also contends it is entitled to judgment in its favor on its facial and as-applied challenges under § (b)(1) of RLUIPA, the Equal Terms provision, which

states that "[n]o government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution." 42 U.S.C. § 2000cc(b)(1). To establish an Equal Terms violation, the plaintiff must make a <u>prima</u> <u>facie</u> showing that it is (a) a religious assembly or institution; (b) subject to a land use regulation; (c) that treats it on less than equal terms; (d) with a nonreligious assembly or institution. <u>Primera Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward Cnty.</u>, 450 F.3d 1295, 1307-08 (11th Cir. 2006); <u>see</u> 42 U.S.C. § 2000cc(b)(1); 42 U.S.C. § 2000cc-2. Importantly, as acknowledged by the City at final argument, if the Church makes the required <u>prima facie</u> showing of unequal treatment, it need not further show that the City was motivated by discriminatory animus or intent. Put another way, if the City treated the Church unequally to a similarly situated, non-religious assembly or institution, the Church need not prove <u>why</u> the City did so.

If the Church makes its <u>prima</u> <u>facie</u> showing, the City then bears the burden of attacking an element of the claim or establishing that the conduct at issue "employs a *narrowly* tailored means of achieving a *compelling* government interest." <u>Primera</u>, 450 F.3d at 1308 (citations omitted). A plaintiff may prove any of three distinct kinds of Equal Terms violations:

> (1) a statute that facially differentiates between religious and nonreligious assemblies or institutions; (2) a facially neutral statute that is nevertheless "gerrymandered" to place a burden solely on religious, as opposed to nonreligious, assemblies or institutions; or (3) a truly neutral statute that is selectively enforced against religious, as opposed to nonreligious assemblies or institutions.

<u>Id.</u>

27

The Eleventh Circuit has explained that, in evaluating unequal treatment, courts do not look for "similarly situated" secular land uses of any kind, but only at "assemblies and institutions." <u>Midrash</u>, 366 F.3d at 1230. Though RLUIPA does not define "assembly" or "institution," the Eleventh Circuit gives the terms their natural (read: dictionary) meaning. <u>Id.</u> So, "[a]n 'assembly' is a company of persons collected together in one place [usually] and usually for some common purpose (as deliberation and legislation, worship, or social entertainment)." <u>Id.</u> (second alteration in original) (quotation omitted). An "institution" is more formal, "an established society or corporation: an establishment or foundation [especially] of a public character." <u>Id.</u> at 1230-31 (quotation omitted).

Here, the Church contends both that the LDC facially treats religious assemblies and institutions differently than secular ones—specifically parks, playgrounds, and recreation centers—and that the City has enforced even the neutral aspects of the LDC selectively by denying the Church a CUP when it has granted CUPs to secular groups in similar circumstances.

### a.  *Facial Challenge and Mootness*

The Court turns first to the Church's facial challenge, specifically, to the impact of the City's recent amendment on its continued viability. Mootness is a threshold jurisdictional issue that the Court must raise even if the parties do not.[18] <u>Seay Outdoor</u>

---

[18] With this in mind, the Court determines that only the Church's facial Equal Terms challenge is potentially mooted by the 2014 Amendment, as its other claims do not rely on the classification of parks, playgrounds, and recreational centers as permitted uses in the LDC.

Adver., Inc. v. City of Mary Esther, Fla., 397 F.3d 943, 946 (11th Cir. 2005). Article III of the U.S. Constitution extends the authority of federal courts only to actual cases or controversies. Covenant Christian Ministries, Inc. v. City of Marietta, Ga., 654 F.3d 1231, 1239 (11th Cir. 2011); Seay Outdoor Adver., Inc., 397 F.3d at 946. There must be a live case or controversy throughout the litigation, not only when commenced. Tanner Adver. Grp., LLC v. Fayette Cnty., Ga., 451 F.3d 777, 785 (11th Cir. 2006).

At the time the Church twice applied for a CUP and was twice denied, the Jacksonville Beach LDC classified "religious organizations" as conditional uses in the RS-1 zoning district, but classified "Public and private parks, playgrounds and recreational facilities . . . for the sole use of residents living in the area where such facilities are located, and . . . not . . . used for commercial purposes" as permitted uses. LDC Sec. 34-336(b)(2). Relying on this allegedly unequal treatment and the Eleventh Circuit's opinion in Covenant, the Court denied the City's motion to dismiss the Church's facial Equal Terms challenge and ordered that it proceed to trial. (Doc. 56 at 18-20.) In direct response to the Court's ruling, on September 15, 2014, two days before trial began, the City amended the LDC to reclassify parks, playgrounds, and recreational facilities as conditional uses on all residential property, including property zoned RS-1. (Def.'s Ex. 33; Pl.'s Ex. 59.)

The City contends that the 2014 Amendment moots the Church's facial challenge. (Doc. 110 at 18-21.) The Church believes the 2014 Amendment is actually an admission by the City that judgment should be entered in favor of the Church, or is potentially an unconstitutional bill of attainder. (Pl.'s Supplement to its Trial Brief,

29

Doc. 93; Doc. 107 at 21-23.) The Court determines that, though the passage of the 2014 Amendment smacks of strategy, it renders the Church's facial challenge moot.

The Eleventh Circuit's opinion in <u>Covenant</u> is controlling here and its remarkably similar circumstances are worth close review. In an effort to address an earlier RLUIPA lawsuit, the City of Marietta, Georgia passed an amendment to its zoning ordinance in 2004 that prohibited religious organizations in a number of residential zoning districts. 654 F.3d at 1236. Just two weeks prior to the passage of the amendment, a non-denominational Christian church had entered into a purchase contract on property zoned residential. <u>Id.</u> The church, unaware of the amendment, eventually closed on the property only to learn later that it could no longer build its church without seeking rezoning. <u>Id.</u> at 1237. The church filed suit against the city, challenging the validity of the 2004 ordinance under the Equal Terms provision of RLUIPA and on other grounds. <u>Id.</u> at 1236-37. The district court eventually granted summary judgment for the city on most of the church's claims, except that it found that the ordinance did facially violate the Equal Terms provision by treating religious assemblies differently than secular assemblies by permitting parks, playgrounds, and neighborhood recreation centers in residential zones, but not religious assemblies. <u>Id.</u> at 1237-38. To remedy this violation, the district court struck parks, playgrounds, and neighborhood recreation centers from the list of permitted uses, effectively prohibiting all assemblies in residential zones. <u>Id.</u> at 1238. Based on the district court's finding of unequal treatment, though, the church then applied in 2008 for permits to start building its facility. <u>Id.</u> At the same time, however, the city again amended its zoning

ordinance, this time to classify all places of assembly as "special uses" requiring approval by the city council. Id.

The Eleventh Circuit eventually faced the question of the whether the 2008 ordinance rendered the church's challenges to the 2004 ordinance moot. Id. at 1238-39. The court started by noting that "[w]hen a party challenges an ordinance and seeks injunctive relief, a superseding ordinance moots the claim for injunctive relief," id. at 1239, but "'only to the extent it removes challenged features of the prior law,'" fundamentally altering the statutory framework, id at 1243 (quoting Naturist Soc., Inc. v. Fillyaw, 958 F.2d 1515, 1520 (11th Cir. 1992)). The court found that the City of Marietta's new ordinance did moot the church's request for injunctive relief:

> We conclude that the 2008 Ordinance has fundamentally changed the City's zoning regulations and mooted Covenant's claims for injunctive relief. The 2008 Ordinance makes places of assembly (including religious institutions), private parks, playgrounds, and neighborhood recreation centers special uses permitted upon approval by the City Council. Under the 2004 Ordinance, churches were completely prohibited in residential zones while all of these other uses were permitted. One of the central allegations of Covenant's First Amended Complaint is that the 2004 Ordinance treats religious institutions differently from other similar uses. Under the 2008 Ordinance, religious institutions in R-2 residential zoning classifications are no longer treated differently than the uses that Covenant identifies as similar in the First Amended Complaint. Therefore, we agree with the district court that the 2008 Ordinance fundamentally altered the statutory framework, and thus the claims for injunctive relief concerning the 2004 Ordinance are now moot.

Id. at 1243 (quotation omitted). Because the church had requested damages in addition to injunctive relief, the court did address the 2004 ordinance substantively and found it invalid. Id. at 1244-46. Though the zoning ordinances in Covenant and in this case started at different places, the respective amendments are similar in that they both equalize the treatment of religious assemblies and other, non-religious

assemblies.

The Church contends the 2014 Amendment is an admission that the LDC originally did treat religious organizations unequally. (Doc. 93 at 3; Doc. 107 at 21.) Indeed, it is hard for the Court to see the amendment and the City Attorney's statement in support of it in any other light. But that admission does not give the Court jurisdiction to issue an injunction to fix a problem that no longer exists.[19]

In its supplemental trial brief, the Church points to the Fifth Circuit's opinion in Opulent Life Church v. City of Holly Springs, Miss., 697 F.3d 279, 285-86 (5th Cir. 2012) as support for the proposition that voluntary cessation of offending conduct does not necessarily moot a controversy.[20] (Doc. 93 at 3-5.) In that RLUIPA case, the defendant city amended its zoning ordinance the night before oral argument before the Fifth Circuit. Id. The court rejected the city's mootness argument because there was nothing preventing the city from reenacting the objectionable ordinance and, in fact, every indication the city would repeat its allegedly wrongful conduct.[21] Id. at 286.

---

[19] To the extent the Church might be heard to argue that its facial challenge is not moot because it requested a different kind of injunction, one that directed the City to grant a CUP rather than to change the LDC, the Court disagrees that a facial challenge to the LDC would entitle the Church to such a remedy. True, a CUP would solve the Church's problems, but would leave the offending ordinance in place. Instead, a proper remedy would be to sever and modify the ordinance itself. See Covenant, 654 F.3d at 1240.

[20] The Church actually raises this issue while arguing that its as-applied Equal Terms challenge is not moot. But the City does not argue that the as-applied challenge is moot, and the Court does not find it moot either.

[21] The Church also misquotes Opulent Life as holding that a request for attorney's fees "'alone is enough'" to keep a controversy alive. (Doc. 93 at 5.) The opinion actually says that, even where an injunction is no longer necessary, a request for *actual damages* and attorney's fees is enough for the court to decide the case. Opulent Life, 697 F.3d at 286. Here, the Church has never sought damages and cites

The evidence in this case, however, provides no similar indication that the City will simply reclassify parks, playgrounds, and recreational centers as permitted uses on residential property upon the conclusion of this case. "'For a defendant's voluntary cessation to moot any legal questions presented and deprive the court of jurisdiction, it must be absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" Covenant, 654 F.3d at 1244 (quoting Nat'l Adver. Co. v. City of Miami, 402 F.3d 1329, 1333 (11th Cir. 2005)). "'[G]overnmental entities and officials have been given considerably more leeway than private parties in the presumption that they are unlikely to resume illegal activities.'" Id. (quoting Nat'l Adver. Co., 402 F.3d at 1333). "The City's purpose in amending the statute is not the central focus of our inquiry nor is it dispositive of our decision. Rather, the most important inquiry is whether we believe the City would re-enact the prior ordinance." Nat'l Adver. Co., 402 F.3d at 1334. "Mere speculation that the City may return to its previous ways is no substitute for concrete evidence of secret intentions." Id.

Director Lindorff testified that the designation of parks, playgrounds, and recreation centers as permitted uses in residential zones in the LDC was likely a vestige of some model zoning code. (Doc. 105 at 181.) There was little need, therefore, to retain that designation since, "[a]s a practical matter as a build-out [sic] community, Jacksonville Beach doesn't have the kinds of green fields that could be developed for -- for residential development that they might desire to include a recreational center."

---

to no authority holding that a request for attorney's fees is enough on its own to avoid a case being moot.

(Id.) With no practical reason for the City to retain the designation in the first place, the Church has supplied no other reason to expect the City to reenact it after this case is closed.

As a final attempt to avoid the effect of the 2014 Amendment, the Church contends it amounts to an unconstitutional "bill of attainder," keying off a discussion the Court had with counsel for the City at the close of trial. (Doc. 107 at 22-23.) This argument merits only brief discussion. The U.S. Constitution prohibits Congress and the States from passing any bill of attainder. U.S. Const. art. 1, §§ 9, 10. "A bill of attainder is 'a law that legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial.'" Houston v. Williams, 547 F.3d 1357, 1364 (11th Cir. 2008) (quoting Nixon v. Adm'r of Gen. Servs., 433 U.S. 425, 468 (1977)). Though the 2014 Amendment has a targeted effect on the Church's lawsuit, its language applies broadly to the entire class of property in the City zoned residential. (See Def.'s Ex. 33.) Moreover, the amendment does not determine the Church guilty of anything or impose the type of legislative punishment prohibited by the Bill of Attainder Clause. Selective Serv. Sys. v. Minn. Public Interest Research Grp, 468 U.S. 841, 852-56 (1984); see Nixon, 433 U.S. at 472 ("Forbidden legislative punishment is not involved merely because the [amendment] imposes burdensome consequences."); cf. Covenant, 654 F.3d at 1240 (finding no error in striking parks, playgrounds, and neighborhood recreation centers from the list of permitted uses rather than including religious organizations). The Court thus declines to find the 2014 Amendment to be an unlawful bill of attainder.

The Court finds the Church's facial Equal Terms challenge moot and will therefore dismiss Count II of the Amended Complaint for lack of jurisdiction.

### b.   *As-Applied Challenge*

The Church's as-applied Equal Terms challenge, Count III, still remains for adjudication. "A plaintiff bringing an as-applied Equal Terms challenge must present evidence that a *similarly situated* nonreligious comparator received differential treatment under the challenged regulation." Primera, 450 F.3d at 1311; Konikov v. Orange Cnty., Fla., 410 F.3d 1317, 1325 (11th Cir. 2005). "If a plaintiff offers no similarly situated comparator, then there can be no cognizable evidence of less than equal treatment, and the plaintiff has failed to meet its initial burden of proof." Primera, 450 F.3d at 1311. Neither party proposes a rubric under RLUIPA for how to decide whether a potential comparator is "similarly situated" for purposes of an as-applied challenge (and neither the statute nor case law specifically defines the phrase), but the Court gleans from authority, including Equal Protection jurisprudence, that "[a] showing that two projects were similarly situated requires some specificity" such that the comparator is identical for all relevant purposes. See Campbell v. Rainbow City, Ala., 434 F.3d 1306, 1314 (11th Cir. 2006). The decision requires a close review of the circumstances of both projects. See Church of Scientology of Ga., Inc. v. City of Sandy Springs, Ga., 843 F. Supp. 2d 1328, 1362-70 (N.D. Ga. 2012) (reviewing comparators for a discrimination claim under RLUIPA). Applying these legal principles to the facts found by the Court, the Court must determine whether the Church has proven by a preponderance of the evidence that the proposed comparator is similarly situated to the Property in the relevant aspects.

The Church initially pointed to four comparators—two churches, one private school, and one public school—where the City granted CUPs to operate on RS-1 property. (Doc. 32 at ¶¶ 37, 87.) For trial, though, the Church appropriately limited itself to the secular comparators: the Duval County School Board and Discovery Montessori School. (Doc. 72 at 18.) The Church alleges that by denying its application but granting these, the City has, in practice, treated the Church on less than equal terms with nonreligious assemblies. The Court addresses each comparator in turn.

### i.    The Duval County School Board

In 1995, the Duval County School Board sought and received permission to make major improvements to an existing middle school that was non-conforming on an approximately twenty-acre lot zoned RS-1. (Pl.'s Ex. 55 at 1; Doc. 105 at 101.) The improvements included replacing 60,000 square feet of existing buildings with 90,000 square feet of new construction, but not increasing school enrollment. (Pl.'s Ex. 55 at 20.) Significantly, the twenty-acre middle school property was located next to another school. (Doc. 105 at 101.) When the School Board's CUP application was brought before the Planning Commission for public hearing, the commissioners asked some questions of the School Board representative, but no one spoke against the application. (Pl.'s Ex. 55 at 21.) The Commission approved the School Board's CUP application. (Id.)

The Church contends that the School Board's application was similar to its own because the School Board intended to use its property for some of the same things the Church intends to use the Property, such as educational activities and assembling together. (Doc. 107 at 25.) While true, these similarities only establish that both uses qualify as an "assembly" and/or "institution" under RLUIPA, a point which the City

36

concedes. From its review of the evidence, the Court finds the Duval County School Board's CUP application too dissimilar in size, intensity of use, location, fit with the surrounding neighborhood, and public support to function as a comparator in the Church's as-applied Equal Terms challenge.

### ii.   Discovery Montessori School

Discovery Montessori School's initial CUP application is a better comparator. In 1994, Discovery Montessori School sought and received a CUP to build a private school on a 1.9-acre parcel in Jacksonville Beach that was zoned RS-1. (Pl.'s Ex. 53 at 1.) The school intended to operate out of a temporary facility until permanent construction was called for. (Def. Ex. 22 at 1.) The temporary facility would house a maximum of twenty students, but the school's site plan called for a permanent facility for seventy-five to eighty students. (Id.) Across the street from the property to the east was the City's public works facilities, to the north and northeast were mobile home parks, to the west was multi-family retirement housing, and to the south were single family homes. (Id.) At the public hearing on the school's application, representatives of the school and four members of the public spoke in favor of the application. (Id. at 1-2.) Six residents of the area around the property spoke against the application, raising concerns about traffic, fit with the neighborhood and the Comprehensive Plan, and the impact on property values. (Id. at 2-3.) The commissioners asked a number of questions about the school's proposal and the potential traffic impact. (Id. at 3-5.) At the close of the hearing, the Commission voted unanimously in favor of approving the school's application to construct the temporary structure on the site with the condition that the school re-appear before the Planning Commission for approval of a permanent

structure.[22] (Id. at 5.)

In 2014, while this case was pending, the Discovery Montessori School applied for a CUP to expand the school to two residential lots adjacent to its current property and build a two-story, 18,000 square-foot building that would support up to 175 additional students. (Pl.'s Ex. 54; Def.'s Ex. 29.) The school met and worked with the Planning and Development Department to address potential traffic issues caused by student drop-off/pick-up times. (Pl.'s Ex. 54 at 3.) The Department found the school's desire to expand to these lots "logical," the school to be a "good steward of the existing property through its incremental expansions since it was established," and the school's site plan to be "a deliberate effort at minimizing any potential off-site impacts due to traffic." (Id. at 3-4.) The Department recommended that the permit be approved with the conditions that the school develop the properties in accordance with the submitted site plan, enforce a staggered drop-off/pick-up time schedule, and provide a crosswalk guard during drop-off/pick-up times. (Id. at 4.) At the March 24, 2014 public hearing on the expansion, one resident of the area raised concerns about parking in the area, while another concurred and expressed concern about traffic. (Pl.'s Ex. 54 at 5.) The Planning Commission unanimously approved the application with the conditions recommended by the Department. (Id.)

The Court finds the Discovery Montessori School's CUP to be a similarly situated comparator for purposes of the Church's as-applied challenge. The school

---

[22] The permanent structure was apparently built, though the record does not contain any materials relating to subsequent approval proceedings for the structure.

proposed a similarly small, relatively low-impact use of property zoned RS-1. The school's property totaled 1.9 acres; the Church has options on between 1.34 and 1.7 acres. Much like the Property at issue here, the area immediately surrounding the school's property was not strictly low-density, single family homes, but included a public works facility across the street, a mobile home park to the north, and a multi-family retirement home to the west. The Property here is bordered by a busy six-lane highway on the north, with overflow parking for an amusement park immediately to the east, the amusement park itself as the very next structure to the east, and a sewage lift station bisecting the main north parcels of the Property from the south parcel. Like the Church, Discovery Montessori faced objections by the neighbors and questions from the commissioners about traffic, fit with the neighborhood, and the impact on property values. Though it is not clear, it appears that the Planning and Development Department generally recommended approval of the school's application, just as it approved the Church's. An even closer review of the Department files for Discovery Montessori's applications (Pl.'s Exs. 53, 54; Def.'s Exs. 21, 22, 29, 30) impresses further with the substantial similarities between the school and the Church with respect to circumstances and the considerations at play in both situations.

But unlike with the Church's application, the Commission did grant the school a CUP with the condition that the Commission approve the final site plan. Here, the Commission voted against a motion to approve the Church's second application with the same condition that the Church must follow its proposed site plan, but gave no

indication why or that it had considered any of the other conditions proposed during the hearing.

Without explanation or citation to authority, the City argues that Discovery Montessori School's CUP application cannot be a similarly situated comparator due to its "remoteness in time." (Doc. 110 at 26.) Remoteness might be an important distinction in some cases, considering the potential for the sensibilities of the community and the policies of the local government to change. However, the Court cannot find the relative remoteness in time significant here. Instead, the City's very recent approval with conditions of Discovery Montessori's application to expand its footprint further into the residential neighborhood adds currency to the City's treatment of the school as compared to the Church. Approval of the School's 2014 expansion affirms that the Planning Commission continues to allow the secular school to operate as a conditional use on RS-1 property, but has now twice denied the Church's similar application.[23]

Undoubtedly, every location and piece of property is unique, every CUP application is different, and no two situations are ever going to be exactly the same. Nevertheless, the Court finds by a preponderance of the evidence that Discovery

---

[23] When asked at oral argument to distinguish between Discovery Montessori School's situation and the Church's, the City cited location (which the Court has already addressed) and the difference in "intensity" of the two uses. However, the School's proposed usage of its property in 1994 was at least as "intensive," if not more so, than the Church's proposed use of the Property, with the School proposing to have eighty children using its property every weekday. Now, with the School's 2014 expansion to an additional 175 students in a second, 18,000 square-foot building, its "intensity" of use has only increased.

Montessori School is a similarly situated comparator and that the Church has adduced prima facie evidence to support its claim that the City violated the Equal Terms provision of RLUIPA by selectively enforcing the LDC in a way that subjected the Church to "less than equal" treatment.[24]

### iii.   Strict Scrutiny

The burden now shifts to the City to establish that its actions in denying the Church's CUP were narrowly tailored to further a compelling government interest. Primera, 450 F.3d at 1308; see 42 U.S.C. §2000cc-2(b). Though raised with respect to the Church's facial challenge, the City maintains that it has a strong interest in preserving the character and safety of its residential neighborhoods through enforcement of its zoning regulations and that the CUP requirement for RS-1 property furthers this interest. (See Doc. 110 at 24-26.) Even assuming that this constitutes a compelling government interest under RLUIPA, the Court finds that a blanket denial of the Church's application was not narrowly tailored to further that interest.

In considering the Church's application, the Planning Commission had a number of options at its disposal short of straight-out denial. Section 34-232 of the LDC allows the Commission to consider imposing a range of conditions on the conditional use to address the interests the City now identifies as important, "including, but not limited to: Limitations on size, bulk and location; requirements for

---

[24] By way of contract, in Primera, the Eleventh Circuit concluded that the church's proposed comparator was not similarly situated for purposes of an as-applied Equal Terms challenge where the comparator property was many times larger than the church's and the comparator had sought and received an entirely different form of zoning relief. 450 F.3d at 1311-13.

landscaping, buffering, lighting, adequate ingress and egress and other on-site or off-site, project-related improvements; duration of the development order; and hours of operation." Even though the City's Planning and Development Department twice recommended approval of the Church's CUP without conditions, during both hearings before the Planning Commission, the Church expressed a willingness to consider and accept some conditions. (See, e.g., Pl.'s Ex 47 at 34-35.) At the second hearing, Mann, the city planner, advised the Commission that it could condition the permit on the Church developing the Property based on the specific site plan submitted with the application. (Id. at 17-18.) Commissioner Dumont moved to do just that, but then voted against her own motion along with the rest of the Commission. (Id. at 43.)

On this record, the City has not met its burden of persuading the Court that, when it twice denied the Church's CUP application, but granted Discovery Montessori School's, its actions were narrowly tailored to further the interests it now identifies as compelling. Accordingly, the Court finds that the Church is entitled to judgment in its favor on its as-applied Equal Terms challenge, Count III of the Amended Complaint.[25]

### 3. The Unreasonable Limitations Provision

The Unreasonable Limitations provision prohibits the imposition or implementation of a land use regulation that "unreasonably limits religious assemblies, institutions, or structures within a jurisdiction." 42 U.S.C. § 2000cc(b)(3)(B). This provision "prevents government from adopting policies that

---

[25] The Court has not considered the proposed testimony from Church witness Fred Atwill that locating the Church on the Property would not reduce surrounding property values as it is not helpful in determining any fact at issue.

make it difficult for religious institutions to locate anywhere within the jurisdiction." Bethel World Outreach Ministries v. Montgomery Cnty. Council, 706 F.3d 548, 560 (4th Cir. 2013) (citing Vision Church v. Vill. of Long Grove, 468 F.3d 975, 990-92 (7th Cir. 2006)). "[T]he purpose of this provision is not to examine restrictions placed on individual landowners, but to prevent municipalities from broadly limiting where religious entities can locate." Church of Scientology of Ga., Inc. v. City of Sandy Springs, Ga., 843 F. Supp. 2d 1328, 1377 (N.D. Ga. 2012) (citing Adhi Parasakthi Charitable, Med., Educ., & Cultural Soc'y of N. Am. v. Twp. of West Pikeland, 721 F. Supp. 2d 361, 387 (E.D. Pa. 2010) and Rocky Mountain Christian Church v. Bd. of Cnty. Comm'rs, 613 F.3d 1229, 1238 (10th Cir. 2010)). The clear implication of the language of § (b)(3)(B) is that a government could *reasonably* limit religious organizations in a way that does not run afoul of this provision. The Southern District of Florida, following the Seventh Circuit's opinion in Vision Church, has held that "'what is reasonable must be determined in light of all the facts, including the actual availability of land and the economics of religious organizations.'" Chabad of Nova, Inc. v. City of Cooper City, 575 F. Supp. 2d 1280, 1289 (S.D. Fla. 2008) (quoting Vision Church, 468 F.3d at 990).

The Church posits that the City's treatment, combined with the Church's limited budget, unreasonably restricts the Church's ability to express its religious beliefs. (Doc. 107 at 26-27.) But again, the focus of the Unreasonable Limitations provision is not on the treatment of a particular landowner, but religious entities in general. Church of Scientology of Ga, 843 F. Supp. 2d at 1377. Otherwise, the

Unreasonable Limitations provision would largely duplicate the Substantial Burden provision. The Church argues that the Planning Commission's rejection of its applications despite a long history of approving CUPs recommended by the Planning and Development Department is evidence of the City's unreasonable limitation of religious assemblies in general; however, the Church has not supported that argument with more than supposition. In fact, the two recent CUPs the City granted for religious organizations that the Church attached to its amended complaint cut against any argument that the City either routinely denies CUP applications from religious groups or holds them to a higher standard than secular groups. (Docs. 32-19, 32-22.)

The Church has not shown by a preponderance of the evidence that the City has broadly limited religious entities' ability to locate within Jacksonville Beach. The evidence was that at least nineteen churches currently operate within city limits (Doc. 105 at 168) and that the great majority of land in the City remains open for use by religious organizations either by right or as a conditional use (though in actuality much of that land may be too expensive for a church to buy), (Pl.'s Ex. 19); LDC Secs. 34-336 to -348. That some land uses would require a conditional use permit is neither unreasonable nor limited to only religious assemblies, institutions, or structures. See Vision Church, 48 F.3d at 990-91. Moreover, while the economics of religious assemblies is a factor to consider, the LDC does not impose special economic hardships on religious assemblies through, for example, oppressive frontage requirements or other restrictions that might force religious assemblies to incur greater costs than secular assemblies. See Chabad of Nova, Inc., 575 F. Supp. 2d at 1289-91. For these

reasons, the Court finds in favor of the City on Count V of the Amended Complaint.

**B.    "Appropriate Relief"**

Having found in favor of the Church on Count III of the Amended Complaint, the Court must fashion a remedy. It appears undisputed that "appropriate relief" for a RLUIPA violation may include injunctive and declaratory relief. See Smith v. Allen, 502 F.3d 1255, 1269-70 (11th Cir. 2007), abrogated on other grounds by Sossamon v. Texas, 131 S. Ct. 1651 (2011); 42 U.S.C. § 2000cc-2(a). However, such "appropriate relief" should be limited to the specific violation found and avoid undue interference with the City's authority and processes. The Church urges the Court to order the City to approve its CUP application without condition (Doc. 107 at 30), but suggested at final argument that it might be open to some conditions. The City did not brief the issue of the appropriate remedy should it not prevail at trial, but argued that any remedy should allow the City to follow the procedures provided for in the LDC.

The Court intends to enter judgment directing the City to grant the Church a conditional use permit to operate on the Property. However, the City may consider whether to impose reasonable conditions on the permit in accordance with the LDC and subject to its procedures. See LDC § 34-232. The Court directs the parties to promptly confer as to what conditions may be appropriate and the proper procedure for issuance of the CUP consistent with the LDC.[26] While the Court expects parties of goodwill to be able to reach agreement on reasonable conditions, the Court will retain

---

[26] The Court also encourages the parties to take this opportunity to discuss settlement of the entire case without further court involvement.

jurisdiction in the event further proceedings are required.

## III.    CONCLUSION

A federal court is rightly circumspect when it is asked to interfere with a local government's zoning decision. However, RLUIPA has been held to be a constitutional exercise of Congress's authority. <u>Midrash</u>, 366 F.3d at 1237-43; <u>see</u> <u>Cutter v. Wilkinson</u>, 544 U.S. 709 (2005). Thus, if a "religious assembly or institution" such as the Church proves its case, RLUIPA provides an "appropriate" federal remedy. This is such a case.

Accordingly, it is hereby

**ORDERED**:

1.     Defendant's Motion for Summary Judgment (Doc. 59) and Supplemental Motion for Summary Judgment (Doc. 95) are **DENIED**.

2.     Defendant's Motion to Strike Plaintiff's Expert Witness (Doc. 60) is **GRANTED** to the extent reflected above.

3.     Plaintiff's Motion to Admit Evidence Pursuant to FRE 1006 (Doc. 62) is **MOOT**.

4.     The parties are **DIRECTED** to confer as outlined above and to jointly file a status report on or before **January 12, 2015**. The Court will withhold entry of judgment until after review of the joint report or as otherwise appropriate.[27] Any requests for attorney's fees or costs, if not resolved by the parties, will be heard upon

---

[27] The form of the Court's judgment, whether it be a mandatory injunction or some other appropriate vehicle, remains to be determined.

a schedule to be determined by the Court at a later date.

       **DONE AND ORDERED** at Jacksonville, Florida this 25th day of November, 2014.

TIMOTHY J. CORRIGAN
United States District Judge

bjb
Copies to:

Counsel of record