**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

CHURCH OF OUR SAVIOR, formerly
known as Resurrection Anglican
Church, Inc., a Florida Nonprofit
Corporation,

        Plaintiff,

v.                                          Case No. 3:13-cv-1346-J-32JBT

THE CITY OF JACKSONVILLE
BEACH, a Florida Municipal
Corporation,

        Defendant.

_____

## <u>O R D E R</u>

On November 25, 2014, the Court entered Findings of Fact and Conclusions of

Law (Doc. 116) ruling that the City of Jacksonville Beach had violated the Equal

Terms provision of the Religious Land Use and Institutionalized Persons Act

(RLUIPA), 42 U.S.C. § 2000cc, when it refused to grant the Church of Our Savior a

conditional use permit ("CUP") to construct a church. --- F. Supp. 3d ---, 2014 WL

6685484. The Court then proceeded to the remedy phase. Trying to fashion the least

intrusive remedy consistent with the RLUIPA violation it had found, the Court stated

its intention to direct the City to grant a CUP but to allow the City to consider

"<u>reasonable</u> conditions on the permit in accordance with the [City's Land Development

Code ("LDC")] and subject to its procedures." (Doc. 116 at 45.) The Court directed the

parties to attempt to work together to identify appropriate conditions. Rather than do

so, however, the parties chose to engage in unnecessarily contentious litigation on topics like how and where they should negotiate on possible conditions, what they should or should not be permitted to say in court filings, the correctness of the Court's original decision, the appropriate remedy, and the amount of attorneys' fees and costs to which the Church's attorneys are entitled.

In light of this impasse, on February 17, 2015, after a teleconference with the parties a week earlier (Doc. 144), the Court entered an Order directing the City to grant the Church a CUP containing any reasonable conditions no later than March 25, 2015 (Doc. 145). The City Planning Commission held a meeting on March 9, 2015, at which time it issued the CUP with certain conditions. (Doc. 164-2.)

On April 10, 2015, the Court conducted a hearing on three issues: the City's motion for reconsideration of the Court's original ruling finding the City to be in violation of the Equal Terms provision of RLUIPA,[1] the Church's objections to some of the conditions imposed by the City on the CUP, and the Church's motion for attorneys' fees and costs. (Doc. 184.) The Court now addresses each of these issues and proceeds to entry of final judgment.

## I.   THE CITY'S MOTIONS FOR RECONSIDERATION

A court may only grant a motion for reconsideration if it is based on "newly-discovered evidence or manifest errors of law or fact."[2] Arthur v. King, 500 F.3d 1335,

---

[1] The City actually filed two motions for reconsideration, one after the Court's ruling and one after the Court ordered the City to issue the CUP. The second motion makes no new arguments, though, and simply adopts those from the first motion. (Compare Doc. 160, with Doc. 124.)

[2] The City moves pursuant to either Federal Rules of Civil Procedure 59(e) or

1343 (11th Cir. 2007). Motions for reconsideration should be viewed with caution and granted only sparingly. United States v. Bailey, 288 F. Supp. 2d 1261, 1267 (M.D. Fla. 2003). "[A] motion for reconsideration is not a substitute for an appeal," and "'cannot be used to relitigate old matters, raise argument or present evidence that could have been raised prior to the entry of judgment.'" Chesnut v. Ethan Allen Retail, Inc., 17 F. Supp. 3d 1367, 1370 (N.D. Ga. 2014) (quoting Michael Linet, Inc. v. Village of Wellington, Fla., 408 F.3d 757, 763 (11th Cir. 2005) and citing Jacobs v. Tempur-Pedic Int'l, Inc., 626 F.3d 1327, 1344 (11th Cir. 2010)). Instead, reconsideration may be justified on one of three grounds: "(1) an intervening change in controlling law; (2) the availability of new evidence; and (3) the need to correct clear error or manifest injustice." Stalley v. ADS Alliance Data Sys., Inc., 296 F.R.D. 670, 687 (M.D. Fla. 2013) (quotations omitted). Simply moving for reconsideration in the hope the court will change its mind, however, is inappropriate. Bryan v. Murphy, 246 F. Supp. 2d 1256, 1259 (N.D. Ga. 2003).

The City's motion essentially argues that if the City had known the Court was going to rule against it on Count III, the as-applied Equal Terms challenge, it would have paid more attention to that count at trial and in its earlier briefing. Half of the motion for reconsideration is given over to the City's collection and review of twelve cases it had not previously cited that it now contends are important for the Court's

---

60(b). Neither rule perfectly applies, as they both provide for relief from judgment, and the Court has not yet entered judgment in the case. Regardless, courts look to similar factors in deciding whether reconsideration of a pre-judgment order is appropriate. See Madura v. BAC Home Loans Servicing L.P., 851 F. Supp. 2d 1291, 1296 (M.D. Fla. 2012).

consideration. The second half of the motion endeavors to more clearly differentiate the circumstances of the Church and Discovery Montessori School than the City had in its motions for summary judgment, at trial, or in its proposed findings of fact. The City also asserts that its motion and the chart attached thereto rely only on evidence that was introduced at trial, none of which the Church actually disputes.

The motion for reconsideration is due to be denied. Though the City resists the charge, even when viewed in the most charitable light, the motion is a do-over, an attempted second bite at the apple. The City acknowledges there is no newly-discovered evidence[3] and points to no intervening change in controlling law since the Court issued its Findings of Fact and Conclusions of Law. Instead, the City tries to more fully present the law and the facts than it did originally, under the guise of helping the Court avoid a supposedly manifest error. Consistent with the standard of review for motions for reconsideration, the Court need not devote much space here to restating the bases for its original ruling, but will only briefly address the arguments raised in the motion to the extent necessary to assure itself no manifest error has been made. Giving the City every possible consideration, the Court also engaged in a full discussion of the motion for reconsideration with the City's counsel during the April 10, 2015 hearing. (See Doc. 184.)

---

[3] The motion does include a statement that the City's believes "the evidentiary record here [is] incomplete, in that the Court has not conducted an in-person view of the [Discovery Montessori School] property, and [the City] requests that the Court do so prior to ruling on this motion." (Doc. 124 at 1-2.) The City never requested a site visit of the Discovery Montessori School before or during trial. The Court declines the request to conduct one now, after trial, on a motion for reconsideration.

The Court does not understand the City to suggest any legal error in the Court's ruling. After previously supplying no standard for deciding whether a comparator was "similarly situated" for an as-applied Equal Terms challenge, the City now agrees in the motion with the standard identified by the Court that, after close review of the circumstances of the projects, the comparator must be identical to the project in question "for all <u>relevant</u> purposes." (See Doc. 116 at 35 (citing Campbell v. Rainbow City, Ala., 434 F.3d 1306 (11th Cir. 2006)).) The Courts interprets the City's lengthy review of cases from outside the Eleventh Circuit (mostly Equal Protection cases) as its effort to glean relevant characteristics for the analysis and to muster examples showing that proving projects are identical is a heavy burden. An observation less explicit in the City's motion, but that the Court takes from these cases, is that the analysis is inherently fact-driven and that care should therefore be taken in extrapolating from one case to another.

Many of the cases upon which the City now belatedly attempts to rely are not RLUIPA cases, but involve claims with an intentional discrimination element. Such cases are not particularly useful in an Equal Terms challenge under RLUIPA where the Church "need not further show that the City was motivated by discriminatory animus or intent. Put another way, if the City treated the Church unequally to a similarly situated, non-religious assembly or institution, the Church need not prove why the City did so." (Doc. 116 at 27.)

In arguing that the Church's proposed use of the property as a church is not "similarly situated" enough to the private school the Court used as a comparator, the

5

City overlooks another important aspect of an Equal Terms challenge under RLUIPA that differentiates it from other types of cases that require similarly situated comparators. In a more typical discrimination case, the comparator and the subject must be aligned in all material respects before they will be deemed to be similarly situated. In this as-applied Equal Terms challenge under RLUIPA, however, the most obvious comparator—another church—is no comparator at all. Rather, the comparison must be between a "religious assembly or institution," such as the proposed church, and a "non-religious assembly or institution." 42 U.S.C. § 2000 cc(b)(1) (emphasis added). It is within this framework—where the Church and the secular comparator are necessarily dissimilar in some respects—that the Court must determine whether "the comparator is identical for all relevant purposes." (Doc. 116 at 35 (citing Campbell, 434 F.3d at 1314).) For the reasons stated in the Finding of Facts and Conclusions of Law, the Court has determined that Discovery Montessori School is a valid secular comparator under RLUIPA. (Doc. 116 at 37-41.)

The motion does not appear to contest the factual findings that led the Court to this conclusion. Instead, the City contends the Court erred in applying the above legal standard to those findings when it held the Church and the Discovery Montessori School to be identical in all relevant aspects. The City identifies a number of allegedly "significant differences" between the Church and Discovery Montessori School that it contends make them less than identical.[4] The Findings of Fact and Conclusions of

---

[4] Again, the City admits that all of the evidence for these alleged differences was available to it at trial. (Doc. 162 at 3.)

Law reflect that the Court has already considered these aspects of the projects, however, and either found them not significant or disagreed with the City's present characterization. But a party's disagreement with the Court is not the same as finding a manifest error in its reasoning requiring reconsideration. See Madura, 851 F. Supp. 2d at 1296. The Court adheres to its reasoning, the City has not identified any manifest error, and the Court therefore determines that the City's motion for reconsideration is due to be denied.

## II.    THE CHURCH'S OBJECTIONS TO THE CONDITIONAL USE PERMIT

In its Findings of Facts and Conclusions of Law, the Court advised the parties that it intended to enter judgment directing the City to grant the Church a CUP. The Court stated, however, that the "City may consider whether to impose reasonable conditions on the permit in accordance with the LDC and subject to its procedures." (Doc. 116 at 45.) After the Court entered its February 17, 2015 Order directing the City to proceed with this remedial phase of the case, the Planning and Development Department prepared a report recommending certain conditions (Doc. 164-1), and the Planning Commission then approved the CUP with those conditions, as follows:

1. The applicant shall develop the subject property in conformance with applicable Land Development Code standards, including but not limited to Residential, single-family: RS-1 zoning district regulations, without exception and without seeking a variance in any respect, including but not limited to lot coverage. No City–owned property may be used by the applicant to meet such standards.

2. The applicant shall provide a seven-foot wide buffer between the subject property and any adjacent residential uses, in conformance with LDC Sec 34-425(b)(2) standards, and including a continuous six-foot high opaque screen or barrier.

7

3.   The applicant shall pay to have installed, a six-foot high opaque fence with 24-foot wide vehicular access gate across the City-owned property known as 11 Hopson Road, between the easterly corner of the property known as #9 Hopson Road and the northerly corner of the property known as #13 Hopson Road. This access to the City's property shall be for exclusive use by City employees.

4.   The City shall prepare a pedestrian-only access easement agreement to the benefit of church staff and congregants across the portion of the City-owned property at #11 Hopson Road lying adjacent to and between the applicant's two parcels. Such agreement shall include a liability insurance policy with coverage of $1,000,000.00 per incident, and shall list the City as an additional insured. The Church shall maintain these policies for so long as it continues to use the City-owned property at #11 Hopson Road for access to the southern parcel. The Church shall submit proof of coverage to the City on an annual basis. The agreement shall otherwise provide that the Church shall indemnify, defend, and hold harmless the City, as to any and all claims for damages which are caused by or suffered by Church staff, congregants, guests, or members while upon the City-owned property at #11 Hopson Road, including but not limited to bodily injury and damage to City property and improvements.

5.   The applicant shall secure Development Plan approval for the development of its proposed facilities within twelve months of issuance of the conditional use permit by the planning commission granting the applicant's conditional use request, or the conditional use approval shall be rendered null and void.

6.   The applicant shall be responsible for payment of applicable water and sewer tap fees, storm water and mobility fees, any related work required to extend existing public utilities to the subject property, and any other development and permit fees associated with its proposed development. However, pursuant to Section 7-21 of the Code of Ordinances, no fees shall be charged to the applicant for permits and inspections for the construction of the applicant's religious facilities, provided the applicant files the required documentation described in Section 7-21 whenever such permit application is filed with the City.

(Doc. 164-2.)

The Church objects to some of these conditions (Doc. 174), and the City has

responded (Doc. 183). The Court fully reviewed the objections at the April 10, 2015 hearing. As the Church does not specifically object to Conditions 2 and 6, the Court will not discuss them further.

Before considering the Church's individual objections, the Court reiterates that it sits neither as a zoning appeals board nor as a state court on a writ of <u>certiorari</u>. <u>See</u> <u>Campell v. Rainbow City, Ala.</u>, 434 F.3d 1306, 1314 (11th Cir. 2006). Deciding whether the City correctly followed its procedures and founded the conditions on "competent, substantial evidence" is not this Court's task. As such, the Church's general objections to the imposition of any conditions on these grounds are rejected. Instead, the Court's task at this stage is to ensure that the City has complied with the Court's ruling and to provide narrowly tailored, "appropriate" relief under RLUIPA. With that understanding, the Court now turns to the Church's primary objections.[5]

On Condition 1, the Church objects primarily to the portion that prohibits it from "seeking a variance in any respect, including but not limited to lot coverage." During the hearing, the Church argued that, while it does not anticipate seeking a variance, it should not be prohibited in advance from doing so. The Court agrees.

The current head of the Planning and Development Department testified at the hearing that, to his knowledge, the City had never granted a CUP on the condition that the applicant cannot seek a variance, and conceded that the City only did so here to prevent litigation on any future variance application. A condition imposed for such

---

[5] A number of the Church's specific objections warrant no discussion and are hereby rejected.

a purpose is at odds with the Court's February 17, 2015 Order and the LDC. See LDC § 34-231 (setting forth appropriate factors for the Commission consideration of a CUP application). The LDC allows property owners to seek variances, LDC § 34-284, and the Church, as a property owner, should not be stripped of the same rights allowed any other owner simply to avoid a potential lawsuit. Therefore, while it rejects the Church's other objections to Condition 1, the Court will strike from Condition 1 the phrase "without exception and without seeking a variance in any respect, including but not limited to lot coverage," such that the Church may apply for a variance in accordance with the LDC.

That being said, the Court imposes no obligation on the City concerning any potential variance request by the Church other than to follow the LDC and give the Church's request the same fair consideration it would give any other applicant. The Court does not opine on the proper outcome of any variance request and does not suggest that this Court would have jurisdiction to hear in this case any potential dispute regarding such a request. In all other respects, Condition 1 will remain in full force and effect.

Turning to Condition 3, the Court rejects the Church's contention that the condition requiring the Church to install a fence across the western face of the adjacent City-owned property is an improper "exaction."[6] Under the LDC, the Planning

---

[6] The Church's present objection to this condition stands in stark contrast to the statements of its representatives at the Planning Commission's meetings specifically proposing this fence as a condition and saying, "You can make [the fence] a condition, we're not going to use [the City-owned property] in terms of traffic." (Doc. 33 at 20; Doc. 33-1 at 34-35).

Commission may "impose such conditions on a conditional use that are necessary to accomplish the purposes of the comprehensive plan and the LDC . . . including, but not limited to . . . adequate ingress and egress and other on-site or off-site projected related improvements . . . ." LDC § 34-232. Affording appropriate deference to the Planning Commission's authority, the Court rejects the Church's objection to the installation of the fence, designed to prevent churchgoers from unauthorized use of City-owned property.[7]

The Church's primary objection to Condition 4 is that the easement across the City-owned property between the Church's north and south parcels is restricted to a "pedestrian-only access easement," as opposed to a broader easement which would, for example, permit utilities to be installed.[8] However, the Church has identified nothing in the CUP process or the LDC that would require the City to allow unlimited easement rights to the Church across City-owned property.[9] While the Court does not preclude the City and the Church from negotiating further easement rights in the future, Condition 4—a pedestrian-only access easement agreement with liability insurance and indemnification requirements—is within the discretion afforded the

---

[7] The Court declines to get involved in the Church's new argument that it, not the City, owns this property. This issue has not been litigated and is not a part of this case.

[8] As depicted in the satellite map accompanying the Findings of Fact and Conclusions of Law (Doc. 116 at 5), the Church's property is bisected by a strip of City-owned property that houses a sewer lift station.

[9] Additionally, the Church's CUP application designated the south parcel as either a children's play area or a public park, not any kind of development requiring utilities or more intensive access across the City property. (Doc. 116 at 10, 12.) The Planning Commission could only base its decision on the proposal presented to it.

Planning Commission by the LDC and does not violate the Court's Order.

Condition 5 requires the Church to secure development plan approval of its proposed facilities "within twelve months of issuance of the conditional use permit..." As the CUP was approved on March 9, 2015, under this provision, the Church would have until March 8, 2016 to secure approval of its development plan.[10] This condition, as presently stated, is sufficiently burdensome as to operate as an effective denial of the Church's application in violation of the Court's February 17, 2015 Order.

The evidence at the April 10 hearing revealed that preparation of a development plan might cost the Church as much as $20,000 or $30,000. The City has made clear it intends to appeal this Court's ruling, leaving open the possibility that the Eleventh Circuit could reverse this Court's decision and revoke the CUP needed for the Church to build on the property. The Court recognizes that section 34-232 of the LDC allows the City to put a time limit on a CUP and also appreciates that the City would want some timeframe for the Church to proceed with this project. However, an appeal is unlikely to be decided by March 2016, so the twelve-month deadline puts the Church in the position of having to spend time and money to secure approval of a development plan before knowing whether it will ultimately be allowed to implement that plan. Therefore, the Court will modify Condition 5 to read:

> The applicant shall secure Development Plan approval for the development of its proposed facility within twelve months of the mandate from the Eleventh Circuit or other final resolution of the federal case, <u>Church of Our Savior v. The City of Jacksonville Beach</u>, Case No. 3:13-

---

[10] The City's formal approval letter is dated March 18, 2015, so the Church may have a few more days to meet the one-year deadline. However, because of the Court's ruling on the deadline, the Court need not decide that question.

cv-1346-J-32JBT (M.D. Fla.), or the conditional use approval shall be rendered null and void.

Thus, the Court upholds the conditions imposed by the City on the CUP issued in favor of the Church as stated in the March 18, 2015 letter (Doc. 164-2), with the exceptions of the prohibition on seeking a variance in Condition 1, which the Court has stricken, and the twelve-month deadline as stated in Condition 5, which the Court has modified.

## III.   THE CHURCH'S FEE PETITION

The Church seeks $851,352.59 in attorney's fees and costs. 42 U.S.C. § 1988 provides a court with the discretion to award the prevailing party in a case under RLUIPA "a reasonable attorney's fee as part of the costs . . . ." 42 U.S.C. § 1988(b). The City agrees that the Church is the prevailing party and, as such, is entitled to reasonable fees and costs. However, the City says that between $72,300.00 and $102,875.00 in fees and no more than $8,092.26 in costs would be reasonable.[11]

The Church argues that its request is fully justified by the results in the case and represents reasonable rates and hours spent on the case, plus a well-earned enhancement to the lodestar. The City responds that the rates and the hours are excessive and contends that no enhancement is appropriate, particularly since the Church succeeded on just one of eight counts it originally filed against the City. In

---

[11] The Court reaches these numbers by adding the fee number from the City's initial response (Doc. 163 at 20) and their expert's opinion of a reasonable range of fees for activity between January 25, 2015 and March 31, 2015 (Doc. 182-1, ¶ 32). The Court has not added any costs amount to the City's initial calculation because it appears the City opposes recovery for any of the Church's recent expenses. (Doc. 187.)

evaluating whether the fees requested are reasonable, a court considers the reasonable hourly rate multiplied by "the number of hours reasonably expended on the litigation," the product of which is the "lodestar" reasonable sum the party may recover. Bivins v. Wrap It Up, Inc., 548 F.3d 1348, 1350 (11th Cir. 2008).

## A.    Rates Charged

In determining the reasonable hourly rate, the court considers "the prevailing market rate in the relevant legal community for similar services by lawyers of reasonably comparable skills, experience, and reputation." Norman v. Hous. Auth. of Montgomery, 836 F.2d 1292, 1299 (11th Cir. 1988). "The relevant legal community" is generally the place where the case is filed. Am. Civil Liberties Union of Ga. v. Barnes, 168 F.3d 423, 437 (11th Cir. 1999). In determining if the requested rate is reasonable, the court may consider the applicable Johnson factors[12] and may rely on its own knowledge and experience. Norman, 836 F.2d at 1299-1300, 1303 ("The court, either trial or appellate, is itself an expert on the question and may consider its own knowledge and experience concerning reasonable and proper fees and may form an independent judgment either with or without the aid of witnesses as to value." (quotations omitted)); see Johnson, 488 F.2d at 717-19. "The applicant bears the

---

[12] The Johnson factors are: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal services properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee in the community; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and the ability of the attorney; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. Johnson v. Ga. Hwy. Express, Inc., 488 F.2d 714, 717-19 (5th Cir. 1974).

burden of producing satisfactory evidence that the requested rate is in line with prevailing market rates," which must be more than just "the affidavit of the attorney performing the work." <u>Norman</u>, 836 F.2d at 1299 (citations omitted). Instead, satisfactory evidence may be opinion evidence or the charges of lawyers in similar circumstances. <u>Id.</u> "The weight to be given to opinion evidence of course will be affected by the detail contained in the testimony on matters such as similarity of skill, reputation, experience, similarity of case and client, and breadth of the sample of which the expert has knowledge." <u>Id.</u>

The Church seeks recovery of fees for three attorneys: lead attorney Daniel Dalton and associate Katharine Brink, both of Dalton & Tomich, PLC in Detroit, and local counsel Charles Stambaugh of Stambaugh & Associates in Jacksonville.[13] The Church seeks to recover at $416.50 per hour and $157.25 per hour for Dalton and Brink, respectively, which it contends reflects a 15% discount from their normal rates of $490 per hour and $185 per hour, respectively, to account for the difference between the Detroit and Jacksonville legal markets.[14] The Church seeks to recover for Stambaugh's work at his ordinary rate of $300 per hour. As evidence that the requested rates are reasonable, the Church submits the declarations of Dalton and Stambaugh, their firms billing records, the declarations of two Florida attorneys, and

---

[13] In a summary of the hours expended per attorney requested by the Court, the Church for the first time mentions time spent on this case by Zana Tomich and Lawrence Opalewski, both also with the Dalton & Tomich firm. (Doc. 185.) Neither attorney has appeared in this case. The Court declines to award any fees for their time.

[14] The Church later proposes to make up for this discount with a 15% lodestar enhancement due to the supposedly excellent results obtained.

three secondary sources.

The City contests each of the three rates as unwarranted by the attorneys' experience and out of line with the Jacksonville legal market. The City argues that Brink, an associate with less than three years of legal experience, should bill at between $135 and $150 per hour. The City prices Stambaugh's time at between $150 and $175 per hour based on his limited federal court experience and limited role in the case. The City concedes that Dalton is an experienced and qualified attorney, but asserts that his RLUIPA experience only supports a rate between $300 and $325 per hour. To support its positions, the City submits an affidavit of an experienced Florida attorney, as well as orders from some of Dalton's recent cases awarding him a rate within the range proposed by the City. The City also propounded interrogatories regarding Dalton's RLUIPA expertise and concludes from its research into his response that no rate premium is justified.

Upon review of the parties' submissions, the Court finds that the Church has not met its burden of producing satisfactory evidence of the reasonableness of the requested rates for Dalton and Stambaugh on either an absolute basis or in relation to the Jacksonville legal market. The Court will start its review with Dalton.

### 1.   **Daniel Dalton**

As the Church's lead attorney, the fees for Dalton's time, $551,737.55, make up the majority of the fees requested by the Church. The Church describes Dalton variously as "the most experienced and most highly sought after attorney representing religious entities throughout the United States," as a "national leader in land use and

RLUIPA litigation matters" who is "in the top 1% of RLUIPA litigators nationally," and the author of "the book on litigating religious land use cases." He has twenty-four years of legal experience and is the founding member of Dalton & Tomich. The Church contends that this expertise justifies his "usual and customary hourly rate for all litigation matters" of $490 per hour, which is in turn verified by the 2014 Michigan Bar survey of legal salaries and billing rates and something called "the Laffey Matrix." Recognizing that rates in the Jacksonville legal market rate are lower than in Detroit, though, the Church seeks only $416.50 per hour. The Church relies on the two Florida attorney declarations to confirm that this discounted rate is reasonable and is consistent with rates in the Middle District of Florida. The Court disagrees with both conclusions.

Dalton is an experienced and qualified attorney. Though his claim to be the best RLUIPA litigator in the country appears hyperbolic,[15] he does have experience in the field that would warrant a somewhat above-median hourly rate. But how he arrived at the rate requested here is unclear. The discounted $416.50 per hour rate is built off of his purported "usual and customary hourly rate" of $490 per hour, then discounted by 15%. Dalton's declaration does not say, however, whether $490 is the "usual and customary hourly rate" that any client has ever actually paid or that any court has ever awarded him. See Dillard v. City of Greensboro, 213 F.3d 1347, 1354-55 (11th

---

[15] The City sought to verify these statements through interrogatories and by researching Dalton's track record in RLUIPA cases. The Court agrees with the City's assessment that "Dalton, like most attorneys, has had some success, as well as some losses." (See Doc. 163 at 7.)

Cir. 2000) (finding that rates actually charged to and paid by clients is "powerful, and perhaps the best, evidence of [the attorneys'] market rate."). The 2014 Michigan Bar survey gives the median rate billed by attorneys with between sixteen and twenty-five years of practice as $269 per hour, with a mean rate of $291 per hour. Dalton's Detroit rate of $490 per hour would place him above the 95th percentile of rates charged by attorneys with his level of experience.[16] Dalton's experience does warrant a rate above the median level, but not the kind of premium the Church requests.

But even if the Court were to assume Dalton's full Detroit rate is reasonable, his discounted rate is not in line with the Jacksonville legal market or the market in the broader Middle District of Florida. The two attorney declarations submitted by the Church are not helpful. One of the attorneys, Judi Setzer, practices regularly in Florida state court and handles adoption law, estate planning, probate, and guardianship. With none of her own experience with cases of this nature, her basis for finding Dalton's rate (and Brink's and Stambaugh's rates) reasonable is her "knowledge of colleagues who litigate religious liberty cases through the United States." (Doc. 127-8, ¶ 8.) Such a secondhand opinion is not competent evidence of the prevailing market rate for the kind of work at issue here. See Norman, 836 F.2d at 1299. The second attorney, Roger K. Gannam, does have experience in the areas of religious liberty and other civil rights cases. Only slightly more detailed than Setzer's, his opinion that the rates "charged" to the Church are reasonable is presented in

---

[16] According to the Michigan Bar survey, Dalton's Detroit rate is also a good deal above the median and mean rates charged by attorneys of all experience levels who practice in downtown Detroit.

conclusory fashion with little support.[17]  (Doc. 127-9.)

The most compelling evidence here, of course, are rates court have actually awarded Dalton. As recently as last year, the Southern District of Mississippi in Hattiesburg awarded Dalton $325 per hour after he sought $390 per hour. (Doc. 163-3.) Before that, in 2010, the Eastern District of Michigan in Detroit cut his requested $425 per hour rate down to $300 per hour. (Doc. 163-4.) Hattiesburg and Detroit are different legal markets than Jacksonville. But based on the Court's review of the materials submitted by the parties, and its own knowledge and experience, the Court finds that a rate of $325 per hour for Dalton's services is reasonable and consistent with the prevailing market rate. See Norman, 836 F.2d at 1303.

### 2.  **Charles Stambaugh**

Stambaugh's declaration represents that he has practiced law since 2007 and focuses on real and personal property, contracts, and "religious liberties." As a member of the Church, he was engaged to represent it before the Planning Commission and then as local counsel after this case was filed. Along with Stambaugh's declaration, the Church also relies on the same two attorney declarations discussed above to show that Stambaugh's $300 per hour rate is reasonable in this market for this kind of case. The City counters these declarations with one from its own expert, opining that Stambaugh's limited federal court experience and role in this case supports a range of

---

[17] The Laffey Matrix is not competent evidence of the prevailing market rate either, as one page submitted by the Church indicates that the matrix is meant to reflect an appropriate rate for attorneys in Washington, D.C. If the Robert Half survey of legal salaries submitted by the Church is any indication of billing rates, rates in the Washington D.C. legal market may be more than 35% higher than in Jacksonville.

$150-175 per hour.

The Court finds a rate somewhere in the middle to be reasonable here. Like Dalton, Stambaugh does not state whether he charges paying clients his supposed "usual and customary hourly rate" of $300 per hour. See Dillard, 213 F.3d 1347 at 1354-55. The Church's attorney declarations touch on Stambaugh's rate even more briefly, and more conclusorily, than they do Dalton's. The City's expert declaration is both more detailed and more helpful. Given Stambaugh's experience and role in the case, the Court finds a $225 per hour rate appropriate.

### 3.   **Katharine Brink**

The Court finds the $157.25 per hour rate requested for Brink reasonable. She has been practicing since 2012, and the billing records reflect that she performed work commensurate with her experience. Based on the Court's own knowledge and experience, her rate is within the range of reasonable rates for attorneys with her experience working on a case of this nature. See Norman, 836 F.2d at 1303.

### B.   **Hours Expended**

Reasonable hours expended are those that are not "'excessive, redundant or otherwise unnecessary'" and that reflect the attorney's exercise of "'billing judgment.'" Id. at 1301 (quoting Hensley v. Eckerhart, 461 U.S. 424, 434, 437 (1983)). The court may conduct an hour-by-hour analysis to evaluate the reasonableness of the hours expended or, if appropriate, apply an across-the-board reduction. Bivens, 548 F.3d at 1351. An across-the-board method is often preferable so as to avoid the "pick and shovel work" of pouring through voluminous billing records. Kenny A. v. Perdue, 532

F.3d 1209, 1220 (11th Cir. 2008); <u>Loranger v. Stierheim</u>, 10 F.3d 776, 783 (11th Cir. 1994) ("Where fee documentation is voluminous, such as the instant case, an hour-by-hour review is simply impractical and a waste of judicial resources. . . . In cases like this one, where the fee motion and supporting documentation are so voluminous, it is sufficient for the court to provide a concise but clear explanation of its reasons for the reduction."); <u>Trujillo v. Banco Central del Ecuador</u>, 229 F. Supp. 2d 1369, 1375 (S.D. Fla. 2002).

The fee records in this case are lengthy and determining how much time either Dalton or Brink spent on a particular task is made more difficult by their practice of block billing.[18] The Court has, nevertheless, reviewed the records and the declarations submitted in support and finds that the hours requested are excessive and do not reflect the exercise of appropriate billing judgment. Dalton's declaration represents that he waived certain hours and excluded excessive or redundant hours, but there is no evidence of it in the records. Neither his declaration nor the billing records identify any hours that were written down as excessive, redundant, or otherwise unnecessary.

As well reconstructed by the City, plenty of excessive time and redundant entries remain in the Church's billing records. By the City's calculation, the attorneys for the Church worked on this case for a total of 1,811 hours during the 389 days from its commencement to the issuance of the Findings of Fact and Conclusions of Law,

---

[18] The review is also made more difficult by the Church's submission of multiple billing records that appear to cover some of the same time periods. (<u>Compare</u> Doc. 143-1 at 2, <u>with</u> Doc. 177-4 at 17.) Also, the Church had not initially provided a breakdown of hours spent by each attorney. It has since done so, at the Court's request. (Doc. 185.) The City disputes the accuracy of the Church's calculations. (Doc. 186.)

roughly the equivalent of working an average of 6.6 hours every business day during that period. A few specific examples are illustrative of the excess and redundancy:

- The Church seeks to recover for 29 hours that Dalton and Brink together billed for a motion to compel that was never filed;

- The records reflect that, even though Dalton was the only attorney ever to question a witness at trial or deposition or to speak in court, two, and sometimes three, attorneys attended every case event for the Church;

- Brink spent much more time preparing summaries of certain depositions than it took to actually conduct the depositions; and

- Dalton and Brink together spent 104 hours, the equivalent of thirteen eight-hour days, preparing the joint final pretrial statement.

The Court agrees that these and other tasks identified by the City reflect excessive time. The level of excess is surprising in light of the RLUIPA expertise claimed by Dalton, which should have brought efficiency. Rather than pick through each and every excessive or redundant charge and determine whether to reduce the charge and by how much, the Court will instead factor the level of excess and redundancy evident in the billing records into its overall determination of the fee award.

The Court also declines to award the Church all of the time spent by Dalton and Brink traveling from Detroit. There is no indication that qualified counsel within the Middle District of Florida could not have been found.[19] Brother Int'l Beach Club

---

[19] This point is made, ironically, by one of the Church's own declarations from an attorney in Orlando who specializes in constitutional civil liberties cases.

Condo. Ass'n, Inc., No. 6:03-CV-444-ORL28DAB, 2005 WL 1027240, at *5 (M.D. Fla. Apr. 28, 2005); ("Travel time is not properly visited on one's adversary, absent a showing of a lack of qualified local counsel."); see Johnson v. Univ. Coll. of Univ. of Alabama in Birmingham, 706 F.2d 1205, 1208 (11th Cir. 1983) ("[T]he exclusion of out-of-town counsel's travel time is proper only if it was unreasonable not to hire qualified local counsel."). The time (at least 158.1 hours) associated with Dalton's and Brink's travel constitute a substantial chunk of the Church's request. The Court will factor this into its ultimate award, as well.[20]

Though the parties have done everything possible to complicate this matter, the required factual development was relatively limited, with much of the record fixed or undisputed. The trial itself only lasted two days, and was followed by two telephone conferences and two in-person hearings. On the other hand, the City heavily litigated this case, particularly after it lost at trial, requiring the Church to respond in kind. The Court will bear these factors in mind, as well.

## C.    Results Obtained

A major dispute between the parties is whether and to what extent any fee award should be reduced or enhanced. After calculating the appropriate rate and number of hours worked, "the court has the opportunity to adjust the lodestar to account for other considerations that have not yet figured into the computation, the most important being the relation of the results obtained to the work done." Dillard,

---

[20] The Court will not eliminate all travel-related time and expenditures, however. Even the City's counsel travelled from Orlando though there was surely qualified counsel in Jacksonville.

213 F.3d at 1353; see Hensley, 461 U.S. at 436 (holding that a fee application based on claims that were "interrelated, nonfrivolous, and raised in good faith" may still be excessive where the applicant achieved only partial or limited success). In rare or exceptional cases, like those involving superior performance, an extreme outlay of expenses, or exceptionally protracted litigation resulting in delay, an enhancement to the lodestar rate may be permitted. North Pointe Ins. Co. v. City Wide Plumbing, Inc., 2014 WL 3540645, *4 (M.D. Fla. 2014) (citing Perdue v. Kenny A. ex rel. Winn, 559 U.S. 542, 552-53 (2010)). However, "the fee applicant bears the burden of providing specific evidence supporting an enhanced award." Id.

The Church contends that it achieved excellent results in spite of the City's alleged bad faith settlement negotiations and intentional multiplication of the proceedings. The Church seeks a 15% enhancement to the lodestar reasonable rate. The Court disagrees that any enhancement is appropriate here.

The City argues, on the other hand, for a fee reduction to reflect that the Church succeeded on only one of the eight counts it initially brought and on only one of the four counts it took to trial. The Church counters that no such reduction is appropriate because, while it did not win on every count of its complaint, it attained the only relief it ever sought, namely an injunction directing the City to issue a CUP.

Counsel for the Church succeeded on the Equal Terms challenge and achieved relief for the Church. However, the Court agrees with the City that the as-applied Equal Terms challenge in Count III on which the Church succeeded was both factually and legally distinct from its other claims and that the fees awarded should reflect some reduction for the Church's only partial success. The evidence introduced on Count III

consisted mainly of the Church's CUP application files and the files of the two secular schools the Church proposed as comparators, at least some of which the Church had in its possession before it filed its first complaint. The Church focused its efforts on its Substantial Burden challenge, which, along with its Unreasonable Limitations challenge, employs a different legal standard and required different proof, and on which it lost.[21] The final fee award will reflect this.

While they do not fit neatly into the traditional attorney's fee calculus, certain aspects of Dalton's work warrant further comment. From almost the beginning—when he requested sanctions against the City for filing a motion to dismiss the Court had specifically authorized (Doc. 41 at 14-15)—but especially after the Court ruled in favor of his client after trial, Dalton has engaged in conduct the Court views as unprofessional. Dalton repeatedly and improperly disclosed what were supposed to be confidential settlement discussions. He repeatedly referred to the City and its lawyers in discourteous terms. As lead trial counsel, he allowed his appellate co-counsel to write a letter directly to City officials (without advance notice to the City's lawyers or their permission) that advised the City it had little chance of winning on appeal and promised further fees should the City choose to appeal. (Doc. 120-1.) This last act, if not unethical, was at best unseemly.[22] The Court expects more from lawyers who

---

[21] The Court will not exclude from the fee award any time spent on Count II of the amended complaint, the facial Equal Terms challenge. This claim was rendered moot only after the City amended the LDC shortly before trial.

[22] In fact, the Court was so concerned about this letter that it convened a telephone hearing to discuss it. (Doc. 121.)

practice in this Court.[23] Moreover, these actions impeded the final resolution of this case. The Court will factor these findings into its fee award in lieu of considering the City's motions for sanctions.

**D.   Expenses**

The City also challenges certain expenses the Church seeks to recover. A good portion of the challenged expenses (at least $25,072.51) reflects airfare, lodging, rental cars, meals, and other travel expenses for Dalton and Brink, which the Court has already indicated are not fully recoverable. The Court also agrees with the City that undifferentiated "office supplies" constitute unrecoverable overhead costs ordinarily built into an attorney's billing rate. Expert witness fees incurred in a RLUIPA action are not recoverable under 42 U.S.C. § 1988. Hodges v. School Bd. of Orange County, Fla., No. 6:11-cv-135-Orl-36GJK, 2014 WL 6455436, at *16 (M.D. Fla. 2014); see W. Va. Univ. Hosps., Inc. v. Casey, 499 U.S. 83 (1991). Costs associated with a rental van to shuttle non-witness Church members to and from court hearings are also not recoverable. The Court will factor all of these reductions in its final award of expenses.

**E.   The Court's Award**

To recap, the Church seeks recovery for 1324.7 hours of Dalton's time, 702.6 hours of Brink's time, and 98 hours of Stambaugh's time.[24] The Court has determined that reasonable rates for Dalton, Brink, and Stambaugh are $325 per hour, $157.25

---

[23] This is not to say that the City's attorneys always covered themselves in glory either. But they are not the ones seeking court-awarded attorney's fees.

[24] Again, the Court declines to award fees for either Tomich's or Opalewski's time. The Court also recognizes that the City disputes the accuracy of these hour totals. The Court will factor any inaccuracies in these numbers into its final award.

per hour, and $225 per hour, respectively. Therefore, if the Court were to award every hour requested by the Church at the rate determined by the Court, the total fee award would be $563,071.35, or $430,537.5 for Dalton's time, $110,483.85 for Brink's time, and $22,050.00 for Stambaugh's time. Adding in the full $47,224.16 in expenses requested,[25] the fee and costs award would total $610,295.51.[26]

The Court finds that an across-the-board reduction of 50% appropriately accounts for all of the factors the Court has considered in this Order. The Court will therefore award $281,535.68 in fees and $23,612.08 in expenses, for a total of $305,147.76.[27]

Accordingly, it is hereby

**ORDERED**:

1.     Defendant's Motion for Reconsideration (Doc. 124) and Defendant's Second Motion for Reconsideration (Doc. 160) are **DENIED**.

2.     Plaintiff, Church of Our Savior's Objections to the Conditions Imposed by

---

[25] The Court refers to Church's April 2, 2015 submission for the total expenses requested, not its April 14 submission. Though it does not separately state the expenses requested, the April 14 submission actually indicates that the Church is now seeking $54,711.89 in expenses, or $7,487.73 more than the amount requested twelve days earlier on April 2. (Compare Doc. 185, with Doc. 177.) The Church has not provided any explanation or evidentiary support for the increase, however.

[26] The Church's requested 15% fee enhancement would bring the fee total to $647,532.05 and the total fee and costs award to $694,756.21.

[27] The Court rejects the last-minute request by the Church for prejudgment interest on its fees, made only vaguely at the April 10 hearing and not in any of its briefs. The Court has reviewed the case referenced by counsel at the hearing, Corder v. Brown, 25 F.3d 833 (9th Cir. 1994), and finds that it does not support the Church's request in this case.

the Planning Commission with Respect to the Adoption of the Conditional Use Permits on March 9, 2015 (Doc. 174) are **SUSTAINED** as to Conditions 1 and 5 only to the extent set forth above, and are otherwise **OVERRULED**.

3.      Plaintiff Church of Our Savior's Motion for Attorney Fees and Cost Pursuant to 42 U.S.C. § 1988(b) (Doc. 127), Plaintiff Church of Our Savior's Supplemental Motion for Attorney Fees and Cost Pursuant to 42 U.S.C. § 1988(b) (Doc. 143), Plaintiff Church of Our Savior's *Amended* Supplemental Motion for Attorney Fees and Cost Pursuant to 42 U.S.C. § 1988(b) (Doc. 146), and Plaintiff Church of Our Savior's *Further Amended* Supplemental Motion for Attorney Fees and Cost Pursuant to 42 U.S.C. § 1988(b) (Doc. 177) are **GRANTED in part** and **DENIED in part** to the extent discussed above.

4.      Defendant's Motion to Strike and Motion for Sanctions (Doc. 136), Defendant's Motion to Strike Portions of Plaintiff's Motions for Attorney Fees and Costs, and Motion for Sanctions (Doc. 149), and Defendant's Supplemental Motion to Strike (Doc. 172) are **DENIED as moot**.

5.      The Court will enter Final Judgment consistent with this Order.

**DONE AND ORDERED** at Jacksonville, Florida this 19th day of May, 2015.

TIMOTHY J. CORRIGAN
United States District Judge

bjb
Copies to:

Counsel of record